## LAMB v. LITTMAN.

(Filed May 28, 1901.)

1. MASTER AND SERVANT—*Employer and Employee—Overseer—Personal Injuries—Bosses.*

It is the duty of the master not to employ incompetent overseers.

2. MASTER AND SERVANT—*Employer and Employee—Overseer—Personal Injuries.*

Where owner of a mill employs an ill-tempered overseer, he will be liable for violent handling of a boy employed under overseer.

ACTION by W. T. Lamb, by his next friend, J. M. Lamb, against I. Littman, heard by Judge *H. R. Bryan* and a jury, at November Term, 1900, of the Superior Court of ROWAN County. From a judgment for the defendant, the plaintiff appealed.

*R. Lee Wright,* and *B. B. Miller,* for the plaintiff.
*Overman & Gregory,* for the defendant.

COOK, J. From a careful review of the evidence, we find that it establishes a *prima facie* case, and his Honor erred

in sustaining the motion to dismiss, as in case of nonsuit, and in not submitting the issues to the jury.   The evidence shows that defendant, in running his mill through agents, had one general superintendent who hired and discharged hands, and also had spinning-room superintendents, bosses or overseers, who controlled and directed the hands in the performance of their work, and also sometimes hired and, in case of disobedience, of which they were the judges, discharged the hands under them.   Burrus was a spinning-room superintendent or boss or overseer, and was in command of the department in which plaintiff, a ten-year-old boy, was a floorsweeper.   Burrus' reputation was bad among mill men; that is, he was mean to children and his help, and it was generally known—and had been so for years—at Albemarle, Concord, Salisbury, and elsewhere, where he had worked in mills. Notwithstanding this fact, which ought to have been known to defendant he was employed in this mill and placed in control of others, including this boy of tender years.   And herein lies the principle involved in this appeal.

In employing servants, the master is under obligation not to associate incompetent ones with the skilled and competent to their hurt and injury.   So much the more, then, is it the duty of the master not to employ unskilled and incompetent bosses or overseers, who are to act in his place and stead over subordinates who are under their care and control and subject to their orders.

It does not appear that Burrus was unskilled, but his incompetency for the supervision of children and other like help is apparent and emphasized by his *bad* character for being *mean* to children and other help.   We have no reason for judging that such character was not *actually* known to defendant; it was generally known among mill men, from whom he might have informed himself if he had inquired, and it was his duty to have been reasonably diligent in ob-

taining the information before entrusting such care and responsibility to him.

In the enlargement of our business and industrial enterprises, made necessary by the rules of economy, it is frequently impossible for the master to give a personal supervision and direction to the business. "It is now universally held in American Courts that a master always *may* and sometimes *must* have a servant who acts as his representative or *alter ego* towards other servants, and that for the negligence of such representative, *while acting as such,* the master is responsible to the other servants, precisely as if it were his own." Shear. and Redf. on the Law of Negligence (5th Ed.), section 226.

While he is responsible to fellow-servants for a failure in duty in not using ordinary care in selecting competent servants, he is also under obligation to them to exercise due care and caution in the selection of his representative or *alter ego,* who orders, commands and controls those committed to his charge.

In the case now being considered, there is no evidence of the unskillfulness of the boss, Burrus, but the evidence shows that he was unfit and incompetent to perform the duties of supervising children and the help under him by reason of his cruel nature and high temper, demonstrated by his treatment of the plaintiff on the day before as well as on that of the injury, which had become so well known as to establish for him a general reputation extending back for six or more years in the divers mills and towns in which he had worked. It is clear that the master would have been responsible for injuries inflicted upon the servants by him, had he (the master) known of such traits of character; and it is equally as clear that he could have obtained the information had he seen fit to inquire; or, having inquired, knowingly and voluntarily assumed the responsibility in employing him and placing

him in that responsible position.   It is true that the burden
of proof is upon the plaintiff to show negligence upon the
part of the master, but in this case it is done and is not con-
tradicted.   Had the master committed the assault, his liabil-
ity would not be questioned.   Then why not be responsible
for his representative whom he knew (or ought to have
known) to have been of such nature and character that the
like result would follow?   Under the contractural relations
existing between plaintiff and defendant, it was the duty of
the plaintiff to render proper service and obey the commands
and directions of his superiors in the service.   It was like-
wise the duty of the defendant under these relations to ap-
point as his representative a fit and competent person—not
one of a cruel and mean nature, who would use violent means
in urging the performance of duty.   We do not wish to be
understood as holding that the master is generally an insurer
of the good conduct of his representative, or an insurer
against his violence resulting from his own malice or ill-will,
or sudden outbursts of temper, although in charge of the
master's business; but only when he puts in such representa-
tive as is by him known, or ought to have been known, to be
violent and mean, and the injury is the natural result of such
character.   It was the duty of Burrus to keep the servants at
work and superintend the same, but it was no part of his em-
ployment to inflict corporal punishment in behalf of the
master.

In *Daniel v. Railroad,* 117 N. C., 592, in which Wood on
Master and Servant, 592, is cited with approval, the master
was a common carrier who had the actual care and
custody of plaintiff's intestate, and was an insurer of his
safety against its own servants as well as co-passengers and
intruders.   In the case at bar, defendant's relation with
plaintiff was in no sense similar.   Plaintiff was a servant
and performing service, and it was his duty to look out for

and protect himself, to obey and conform to the rules and requirements within the scope of his employment—quite different from that of a passenger who was paying for the protection and service being rendered to him.

Had the plaintiff been injured by dangerous or defective machinery used by the defendant in running his mill, *while in the performance of the work assigned him,* we would consider the contention upon that subject. But it appears that the injury received was caused by the violent handling of plaintiff by defendant's *alter ego* in urging him to the proper performance of his work. The obligation to furnish reasonably secure machinery and appliances is limited to the use of those in its employ, and not to provide against accidents to those who *might,* by violence not anticipated, or negligence, or those uninvited, come in contact with it. The injury inflicted by the shoving of plaintiff by Burrus might have been even more serious, had he fallen upon the floor, by the breaking of a limb, or still more serious by the falling down a stairs, or out of a door, or upon some pointed implement lying in the wayside.

There is error.