MICHAEL KEITH BRASWELL, Administrator of the Estate of Lillie Stancil Braswell, Deceased v. BILLY R. BRASWELL and RALPH L. TYSON, Sheriff of Pitt County

No. 225A90

(Filed 6 December 1991)

1. **Public Officers § 10 (NCI3d)— public duty doctrine—expressly adopted**

   The public duty doctrine, with its exceptions, is adopted. A municipality and its agents act for the benefit of the public and there is no liability for the failure to furnish police protection to specific individuals. There are two exceptions: where there is a special relationship between the injured party and the police; and when a municipality, through its police officers, creates a special duty by promising protection to an individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered.

   **Am Jur 2d, Sheriffs, Police, and Constables § 94.**

   **Personal liability of policeman, sheriff, or similar peace officer or his bond, for injury suffered as a result of failure to enforce law or arrest lawbreaker. 41 ALR3d 700.**

2. **Sheriffs and Constables § 4 (NCI3d)— domestic violence by deputy sheriff—failure of sheriff to protect victim—directed verdict for sheriff**

The trial court properly granted a directed verdict for defendant sheriff in an action for damages from the sheriff's allegedly negligent failure to protect a decedent from a domestic assault by a deputy sheriff where plaintiff relied upon the special duty exception to the public duty doctrine and the only promise arguably specific enough to trigger the exception to the public duty doctrine was the sheriff's alleged promise to see that the victim got to and from work safely, but it was conceded that the victim was not driving to or from work when she was killed.

**Am Jur 2d, Sheriffs, Police, and Constables § 94.**

**Personal liability of policeman, sheriff, or similar peace officer or his bond, for injury suffered as a result of failure to enforce law or arrest lawbreaker. 41 ALR3d 700.**

3. **Sheriffs and Constables § 4 (NCI3d)— domestic violence by deputy sheriff—negligent supervision and retention—directed verdict for defendant**

The trial court did not err by granting a directed verdict for defendant in an action for negligent supervision and retention of a deputy sheriff who killed his wife and then shot himself. The untoward behavior at issue here occurred outside the workplace and while the transgressor was off duty, circumstances indisputably allowing the employer lesser control; the deputy was known as stable and even tempered, with the exception of the domestic dispute with his wife; there is no indication in the record that the emotionally charged relationship spilled over into the deputy's work or that his official capacity would in any way be used to further his tortious conduct; and it cannot be said as a matter of law that plaintiff has overcome by the greater weight of the evidence the presumption favoring the sheriff's proper retention and supervision of his employee. The theory of imputing liability to an employer solely on the basis of an employee using a chattel of the master is not recognized; moreover, even if it were recognized, the chattel of the master theory is not satisfied under the facts of this case. Finally, it seems clear

BRASWELL v. BRASWELL

[330 N.C. 363 (1991)]

that nothing the sheriff did or failed to do was a proximate cause of the victim's death.

**Am Jur 2d, Sheriffs, Police, and Constables § 150.**

4. **Evidence and Witnesses §§ 298, 1009 (NCI4th)— domestic violence by deputy—action against sheriff—evidence not admissible**

. The trial court did not err in an action against a sheriff arising from the killing by a deputy of the deputy's wife by not permitting plaintiff, the son, to testify about prior acts of violence and threats by his father towards his mother, or about the sheriff's conversations with and assurances to his mother. The court found that plaintiff had a pecuniary interest in the outcome of the proceedings and may have been prejudiced, which would more than offset any inherent trustworthiness of the evidence, and plaintiff put forth no reason why the trial court's decision was an abuse of discretion.

**Am Jur 2d, Witnesses §§ 108, 109.**

5. **Evidence and Witnesses § 2148 (NCI4th)— domestic violence by deputy—action against sheriff—expert testimony—not admissible**

The trial court did not err in an action against a sheriff arising from the killing of a deputy's wife by the deputy by excluding expert opinions that inaction by defendant contributed to the victim's death, that the investigation of the victim's death was inadequate, and that there was information available to defendant that the deputy was unfit to carry a gun. The testimony of the criminologist would not have assisted the jury in determining whether the inaction of the defendant significantly contributed to the victim's death, and the testimony of the psychologist was excluded on the grounds of relevancy because much of the evidence concerned prior violence, which the trial judge had already found to be inadmissible. Furthermore, the jury was in as good a position as the expert to determine whether there was sufficient data concerning the deputy's fitness to carry a gun.

**Am Jur 2d, Expert and Opinion Evidence §§ 41-44.**

**6. Evidence and Witnesses § 300 (NCI4th) — domestic violence by deputy — action against sheriff — prior acts of violence — not admissible**

The trial court did not err by excluding prior acts of violence in an action against a sheriff for negligent supervision and retention of a deputy who killed his wife in a domestic dispute. The acts in question were too remote in time to be relevant to defendant's knowledge of the deputy's current dangerous propensities, and the letters were unopened prior to the victim's death and therefore not probative of defendant's knowledge.

**Am Jur 2d, Evidence §§ 298, 303; Sheriffs, Police, and Constables § 150.**

ON discretionary review pursuant to N.C.G.S. § 7A-31 and on appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 98 N.C. App. 231, 390 S.E.2d 752 (1990), affirming in part and reversing in part the judgment of *Smith (Donald L.), J.,* dated 8 October 1987 in Superior Court, PITT County. Heard in the Supreme Court 14 February 1991.

*Law Offices of Marvin Blount, Jr., by Marvin Blount, Jr., and Joseph T. Edwards, for plaintiff-appellant and -appellee.*

*Womble Carlyle Sandridge & Rice, by Richard T. Rice and J. Daniel McNatt, for defendant-appellant and -appellee Tyson.*

MEYER, Justice.

This lawsuit arose out of the murder of Lillie Stancil Braswell by her estranged husband, Deputy Sheriff Billy R. Braswell. On the morning of 27 September 1982, a passing motorist found the body of Lillie Braswell on Chinquapin Road near Farmville, North Carolina. The parties stipulated that Lillie, age thirty-nine, died as a result of gunshot wounds inflicted by Billy Braswell, who had served for thirteen years as a deputy sheriff for defendant, Pitt County Sheriff Ralph Tyson. Plaintiff, the son of Lillie and Billy Braswell and the administrator of Lillie's estate, sued both his father and Sheriff Tyson. A voluntary dismissal was taken with respect to defendant Billy Braswell. Plaintiff proceeded to trial on two negligence claims against Sheriff Tyson, negligent failure to protect and negligent supervision and retention of Deputy

## BRASWELL v. BRASWELL

[330 N.C. 363 (1991)]

Braswell, but directed verdict was granted in defendant Tyson's favor at the close of plaintiff's evidence.

Plaintiff appealed to the Court of Appeals, which found no error with respect to the dismissal of the negligent supervision and retention claim but held that the trial court erred in dismissing the claim against defendant Tyson on the issue of negligent failure to protect. Judge Greene dissented from that portion of the majority's opinion affirming the trial court's directed verdict for defendant on the negligent supervision and retention claim. Plaintiff appeals to this Court as of right by reason of the dissenting opinion. Additionally, defendant Tyson filed a petition for discretionary review, requesting review of whether the Court of Appeals was correct in its determination that the trial court erred in directing verdict for defendant as to the failure to protect claim and further requesting that we review whether the trial court erred in admitting hearsay statements not covered by any hearsay exception. This petition was allowed 27 July 1990.

In reviewing the grant of directed verdict for defendant, we must consider the evidence in the light most favorable to the plaintiff, resolving contradictions and discrepancies in his favor. *Sharp v. Wyse*, 317 N.C. 694, 346 S.E.2d 485 (1986). Moreover, plaintiff's evidence must be taken as true, and he is entitled to every reasonable inference to be drawn from the evidence. *Id.* The question presented on appeal is whether the evidence, taken in the light most favorable to plaintiff, was sufficient to take the case to the jury. *Hitchcock v. Cullerton*, 82 N.C. App. 296, 297, 346 S.E.2d 215, 217 (1986). Erroneously admitted evidence must be considered in ruling upon a motion for directed verdict. *Koury v. Follo*, 272 N.C. 366, 158 S.E.2d 548 (1968). Where the evidence is sufficient to support all the elements of plaintiff's claim, defendant's motion for directed verdict should be denied.

In the light most favorable to the plaintiff, the evidence tends to show the following. On Wednesday evening, 22 September 1982, Lillie Braswell moved out of the home that she shared with her husband. That morning she met with Sheriff Tyson and related her fears that Billy would kill her if she remained in the home. His behavior had become more irregular, and he had recently spent much time staring at her while tapping three envelopes on his knee. When Lillie told Billy she was leaving, he told her that neither of them was going anywhere and that if he could not have

BRASWELL v. BRASWELL

[330 N.C. 363 (1991)]

her, nobody could. Sheriff Tyson related to Lillie that if she discovered the contents of the envelopes, she should let him know. That afternoon, Lillie called Tyson from her place of work to inform him that she had located the envelopes. She informed Sheriff Tyson of the "gist" of the letters. At about this time, Tyson also dispatched two deputies to check on Billy. Both reported that Billy appeared neither homicidal nor suicidal.

While moving out of her house, Lillie discovered the three letters Billy had been tapping on his knee; one was addressed to their son, Mike. The letter read, in pertinent part, as follows:

Well Mike by now you already know what has happen[ed].
. . .

. . . .

. . . All I can say is son I loved your mother, and I just couldn't stand to see her leave me. . . .

I just hope Mike that you didn't have to see this mess. But if you did, please put it out of your mind. And please don't ever go back to this house again, it'll only hurt you more.

Mike get Jimmy to help you with the property settlement, he knows what to do. . . .

. . . .

Please, Mike don't hold this against me. I know it's the worst thing any one can do, but I feel there is a reason for doing this. I just need the rest, and I couldn't go alone.
. . .

. . . .

Mike there is one thing I would like for you to make sure it is done. I would like very much for me and Lillie [to] be placed side by side, along with Granddaddy in Wilson. There might be some talk about that, but please be sure that we are placed beside each other. . . .

. . . .

. . . And Mike I'm sorry for doing this to you, but I just can't see any other way. I just love Lillie to [sic] much to see her leave me.

The other envelopes, unopened at Lillie's death, were addressed to Billy's brother and to Deputy Sheriff Brooks Oakley, Billy's friend and co-worker.

Lillie spent Wednesday, Thursday, and Friday nights with a friend, Marguerite Taylor, in Greenville. Taylor called Sheriff Tyson on Wednesday because she was concerned about being involved in a domestic dispute. Tyson told her that he believed it would be a good idea for Lillie to stay with her, that he would keep Lillie's whereabouts confidential, and that Taylor should call if she needed him.

Lillie spent Saturday night with her best friend, Lila Joyner. Lila helped Lillie remove more of her clothes from the house. Lillie told her that she showed the letters she found to Sheriff Tyson, and he told her that Billy would not harm her.

On Sunday, the day before her death, Lillie spent the night with another friend, Hilda Joyner. Hilda testified that Lillie talked about moving to another part of the country but thought that Billy had sources and could track her down wherever she went. According to Hilda Joyner, Sheriff Tyson told Lillie that "he would see she got back and forth to work safely . . . [and] that his men would be keeping an eye on her." Hilda testified that the promise was as much a promise to keep an eye on Billy as a promise to watch Lillie, "that he was to . . . watch out for her . . . [and] make sure Billy . . . didn't bother Lillie." When Lillie left for work on Monday morning, she said that she was going to be all right and that she was going to get things straightened out.

When Lillie arrived at work in Greenville on Monday, 27 September 1982, she telephoned her attorney, who agreed to meet with her at his office in Farmville. She took with her the three letters and a copy of the separation agreement Billy's attorney had written. Lillie never arrived in Farmville. After her body was discovered at approximately 11:30 a.m., deputies began searching for Billy. They located him at his house in Farmville, sitting in a recliner with two gunshot wounds to his chest. Billy asked the officers at the scene to let him die. Parked in the carport outside the home was the silver sheriff's department vehicle Billy had been driving while his regularly assigned brown sheriff's vehicle was being repaired. The driver's door of the car was open. One revolver was in the car, and another revolver was inside the house.

Billy Braswell survived the attempted suicide and was tried, convicted, and sentenced to life imprisonment for the murder of his wife.

At trial, Sheriff Tyson testified that Lillie told him that Billy had beaten her five years earlier and had threatened her with a firearm, and that he had heard about the incidents shortly after they happened. Lillie also told him that Billy had put a gun to her head several years earlier. There were no records in Billy's personnel file concerning these incidents. Sheriff Tyson testified that Lillie never actually showed him the contents of the letter from Billy to his son Mike, but only told him the gist of it. She also related Billy's statement, "If I can't have you, nobody is going to have you." He sent Deputy Harris to talk with Billy, and Harris told Sheriff Tyson that, in his opinion, Lillie and Billy were just having marital problems. Sheriff Tyson denied making any promises to protect Lillie and testified that he told Lillie she would have to file the appropriate legal papers before he could take steps to protect her.

A criminologist testified that Sheriff Tyson's inaction violated the standards and procedures of the law enforcement profession; that where there is any hint that an officer might abuse the vast amount of power with which he or she is vested, for example, the power to carry concealed weapons, the supervisor should undertake a thorough investigation and talk with the individual personally; and that should the investigation reveal the necessity of suspension or dismissal, the supervisor should take such action immediately. A clinical psychologist testified that Billy's letter to Mike indicated both suicidal and homicidal intentions and that Billy was clearly a danger to himself and others prior to Lillie's death.

[1] The first issue for review involves Sheriff Tyson's alleged negligent failure to protect Lillie Braswell. Defendant argues that the Court of Appeals erroneously reversed the trial court's order of directed verdict in his favor in the plaintiff's claim that Sheriff Tyson had negligently failed to protect Lillie Braswell. We agree.

The general common law rule, known as the public duty doctrine, is that a municipality and its agents act for the benefit of the public, and therefore, there is no liability for the failure to furnish police protection to specific individuals. *Coleman v. Cooper*, 89 N.C. App. 188, 193, 366 S.E.2d 2, 6, *disc. rev. denied*, 322 N.C. 834, 371 S.E.2d 275 (1988). This rule recognizes the limited resources of law enforcement and refuses to judicially impose an overwhelm-

ing burden of liability for failure to prevent every criminal act. *Id.*

> The amount of protection that may be provided is limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed. For the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be the particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources . . . should be allocated and without predictable limits.

*Riss v. City of New York*, 22 N.Y.2d 579, 581-82, 240 N.E.2d 860, 860-61, 293 N.Y.S.2d 897, 898 (1968); *accord Cuffy v. City of New York*, 69 N.Y.2d 255, 505 N.E.2d 937, 513 N.Y.S.2d 372 (1987).

While this policy is a necessary and reasonable limit on liability, exceptions exist to prevent inevitable inequities to certain individuals. There are two generally recognized exceptions to the public duty doctrine: (1) where there is a special relationship between the injured party and the police, for example, a state's witness or informant who has aided law enforcement officers; and (2) "when a municipality, through its police officers, creates a special duty by promising protection to an individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered." *Coleman v. Cooper*, 89 N.C. App. at 194, 366 S.E.2d at 6; *see also Martin v. Mondie*, 94 N.C. App. 750, 752-53, 381 S.E.2d 481, 483 (1989). Although we have not heretofore adopted the doctrine with its exceptions, we do so now.

[2] Plaintiff in the instant case relies upon the "special duty" exception as a basis for liability. To make out such a prima facie case, plaintiff must show that an actual promise was made by the police to create a special duty, that this promise was reasonably relied upon by plaintiff, and that this reliance was causally related to the injury ultimately suffered by plaintiff.

Defendant first contends that the alleged promises were not of the type that create a special duty. Plaintiff's evidence tended to show that Sheriff Tyson stated that Billy would not harm Lillie and that his men would be keeping an eye on her, and promised only that Lillie would get to and from work safely. Defendant argues that these statements, if made, were general words of com-

fort and assurance, commonly offered by law enforcement officers in situations involving domestic problems, and that such promises were merely gratuitous and hence not sufficient to constitute an actual promise of safety. We agree.

Although plaintiff's evidence was that Sheriff Tyson indicated to Lillie that he thought she would be safe, there is absolutely no evidence tending to indicate that he expressly or impliedly promised her protection at any time other than when she was driving to and from work. Even taking the evidence in the light most favorable to nonmovant plaintiff, as we must, we find no evidence of a promise made by Sheriff Tyson which would warrant a special duty that would encompass protection on a full-time basis. The only promise arguably specific enough to trigger the exception to the public duty doctrine was Tyson's alleged promise to see that Lillie got to and from work safely. It is conceded by all parties that Lillie Braswell was not driving to or from work when she was killed; she was driving to her attorney's office at 11:00 a.m. Her midday trip to perform this personal errand during working hours had nothing to do with her commuting to and from work and hence was outside the scope of protection arguably promised by Sheriff Tyson.

Thus, even if there were a promise to provide protection while traveling to and from work, Lillie's alleged reliance on Tyson's promise cannot in any way be considered to have caused her death. *See Kanoy v. Hinshaw,* 273 N.C. 418, 426, 160 S.E.2d 296, 302 (1968).

In sum, the "special duty" exception to the general rule against liability of law enforcement officers for criminal acts of others is a very narrow one; it should be applied only when the promise, reliance, and causation are manifestly present. *See Cuffy v. City of New York,* 69 N.Y.2d 255, 505 N.E.2d 937, 513 N.Y.S.2d 372. In the instant case, the facts do not suffice to make a claim for negligent failure to protect under the "special duty" exception.

[3] We next examine the plaintiff's argument that the trial court erred by dismissing his claim for negligent supervision and retention. In essence, plaintiff contends that Sheriff Tyson was negligent in continuing to retain Billy Braswell in his employ and in failing to properly supervise Braswell after learning of Braswell's erratic behavior. We agree with the trial court and the majority in the Court of Appeals that this claim is not viable, given the evidence here.

BRASWELL v. BRASWELL

[330 N.C. 363 (1991)]

Our courts in the past have acknowledged the existence of a cause of action for negligent supervision and retention. In *O'Connor v. Corbett Lumber Corp.*, it was noted that:

> [E]mployers have been held independently liable under the doctrine of negligent hiring or retention of incompetent or unfit employees. There the theory of liability is that the employer's negligence is a wrong to third persons, entirely independent of the employer's liability under the doctrine of *respondeat superior.*

84 N.C. App. 178, 182-83, 352 S.E.2d 267, 270-71 (1987) (citation omitted); *see also Wegner v. Delicatessen*, 270 N.C. 62, 65-66, 153 S.E.2d 804, 807 (1967); *Pleasants v. Barnes*, 221 N.C. 173, 177, 19 S.E.2d 627, 629 (1942); *Shorter v. Cotton Mills*, 198 N.C. 27, 30, 150 S.E. 499, 500 (1929); *Walters v. Lumber Co.*, 163 N.C. 536, 541-42, 80 S.E. 49, 51-52 (1913); *Lamb v. Littman*, 128 N.C. 361, 363-64, 38 S.E. 911, 911-12 (1901); *Hogan v. Forsyth Country Club*, 79 N.C. App. 483, 494, 340 S.E.2d 116, 123-24, *disc. rev. denied*, 317 N.C. 334, 346 S.E.2d 140 (1986). In such actions,

> the presumption is that the master has properly performed his duty in selecting his servants, and before responsibility for negligence of a servant, proximately causing injury to plaintiff . . . can be fixed on the master, it must be established by the greater weight of the evidence, the burden being on the plaintiff, that he has been injured by reason of carelessness or negligence . . . and that the master has been negligent in employing or retaining such incompetent servant, after knowledge of the fact, either actual or constructive.

*Pleasants v. Barnes*, 221 N.C. at 177, 19 S.E.2d at 629.

With the exceptions of *Lamb* and *Hogan*, in none of the cases cited above was the cause of action allowed. Significantly, both *Lamb* and *Hogan* involved well-known and certain, ongoing foreseeable harms occurring on the employer's premises while the employee was on duty. In *Lamb*, a case decided in 1901, the Court reversed a nonsuit in which an employer was sued for hiring and retaining as a supervisor an individual widely known to be surly, violent, and ill-tempered toward children. There, the employee pushed to the floor and injured a ten-year-old boy who was working as a mill floor-sweeper. In so deciding, the Court attached special importance to the fact that the employer hired and retained such

a person to serve in the capacity of supervisor, a position inevitably involving interaction with the children who worked in the mill, and responsibility for the care and control of others. *Lamb*, 128 N.C. at 363, 38 S.E. at 911-12.

Similarly, in *Hogan*, the court deemed plaintiff's forecast of evidence sufficient to maintain her claim that her employer was liable for the negligent retention and supervision of plaintiff's co-worker, who repeatedly sexually harassed her at work. The manager had been repeatedly informed by plaintiff of the activity and failed to intercede. The court held that it was a jury question whether defendant, through its manager, failed to exercise reasonable care over its supervisory personnel to prevent the behavior directed toward the plaintiff. *Hogan*, 79 N.C. App. at 492, 340 S.E.2d at 122.

The instant case does not involve such facts. Unlike *Hogan* and *Lamb*, the untoward behavior at issue here occurred outside the workplace and while the transgressor was off duty, circumstances indisputably allowing the employer lesser control. Moreover, with the exception of the domestic dispute with his wife Lillie, Billy Braswell was otherwise known as stable and even-tempered. There is no indication in the record that the Braswells' emotionally charged relationship spilled over into Mr. Braswell's work as a law enforcement officer or that his official capacity would in any way be used to further his tortious conduct. Finally, we cannot say as a matter of law that plaintiff has overcome by the greater weight of the evidence the presumption favoring Sheriff Tyson's proper retention and supervision of his employee Billy Braswell.

Judge Greene, partly concurring and partly dissenting, concluded that the trial court erred in its determination that plaintiff failed to make out a prima facie case of negligent supervision. In reaching his conclusion that plaintiff presented evidence sufficient to support a claim of negligent supervision, Judge Greene attached great importance to the Restatement (Second) of Torts § 317. This section provides:

> § 317. Duty of Master to Control Conduct of Servant
>
> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

BRASWELL v. BRASWELL

[330 N.C. 363 (1991)]

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

A review of our pertinent case law reveals no support for the application of this particular section of the Restatement. We find no case in which liability has been imputed to an employer solely on the basis of an employee "using a chattel of the master." We decline to recognize this theory of liability in the situation presented in this case. Moreover, even if we were to recognize this theory, we do not find that the "using a chattel of the master" theory is satisfied under the facts of this case. The evidence taken in the light most favorable to the plaintiff will not support a reasonable finding that "using a chattel of the master" caused Lillie Braswell's death. No one saw Lillie's husband, Deputy Sheriff Billy Braswell, kill her. Lillie was found shot to death beside her car on Chinquapin Road in Pitt County, several miles from the Braswell home. Shortly after discovering Lillie's body, law enforcement officials discovered a sheriff's department vehicle, which had been temporarily assigned to Deputy Braswell, parked in the carport outside the Braswell home. A Colt revolver containing six empty shell casings and a necktie with a hole in it were in the vehicle. There is no evidence that the sheriff's department vehicle in question was anywhere near the scene of Lillie Braswell's murder. Moreover, there is no evidence that the vehicle was equipped with a blue light or siren, making very tenuous any argument that some coercive influence of Braswell's law enforcement status was at play.

The evidence tends to show that after discovering the vehicle, law enforcement officials entered the Braswell home. They found a Smith and Wesson revolver containing one empty shell casing on the floor of the den and discovered Deputy Braswell sitting

in a chair in the house with two bullet wounds to his chest. There was no ballistics evidence or evidence of any other nature tending to show that either of the pistols found was used in the murder of Lillie Braswell, that either pistol had been provided to Braswell by Sheriff Tyson or the sheriff's department, or that the department required Braswell to carry weapons while off duty.

Finally, it seems clear that nothing Sheriff Tyson did or failed to do was a proximate cause of Lillie Braswell's death. Tyson instructed two deputy sheriffs to speak with Braswell and check on his mental condition. They reported that Braswell was experiencing marital problems but otherwise appeared normal. Sheriff Tyson himself spoke with Braswell and inquired whether he needed some time off. Braswell informed Tyson that he needed no time off, and Tyson concluded that Braswell was stable. Finally, and perhaps most significantly, in addition to being Sheriff Tyson's employee, Deputy Braswell was Lillie Braswell's husband. All of the evidence tends to show that he had firmly made up his mind to kill her and was willing to, and in fact intended to, give up his own life in the process. That being so clearly the case, there simply was little Sheriff Tyson could have done, acting within the constraints placed upon him by law, to prevent the killing in this case. Indeed, Braswell would have had the same access to his own weapons or another vehicle regardless of any action by Sheriff Tyson. It is a sad but certain fact that some individuals commit despicable acts for which neither society at large nor any individual other than those committing the acts should be held legally accountable. This is such a case.

We next examine the evidentiary issues brought forward by plaintiff.

[4] Plaintiff alleges that the trial court erred in excluding certain evidence that would have further supported his claims. First, he contends that the court improperly limited his own testimony concerning defendant's promises to protect Lillie and failed to allow him to make a proper offer of proof under the residual exception to the hearsay rule to preserve the record on appeal. The trial court found that plaintiff had a pecuniary interest in the outcome of the proceedings, and therefore, he may have been biased or prejudiced, which would more than offset any inherent trustworthiness of the evidence. Plaintiff was not permitted to testify about prior acts of violence and threats by his father towards his mother

or about Sheriff Tyson's conversations with and assurances to his mother. Plaintiff puts forth no reason why the trial court's decision was an abuse of discretion, other than that the testimony would have supported his claim. We find no abuse of discretion and overrule this assignment of error. *See State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985).

[5] Plaintiff next argues that the trial court erred by excluding expert opinions that would have been helpful to the jury. The North Carolina Rules of Evidence allow the admission of expert opinion testimony if it will assist the trier of fact in understanding the evidence or determining a fact in issue. N.C.G.S. § 8C-1, Rule 702 (1988). Plaintiff contends that the trial court erred by preventing his expert criminologist from testifying that the inaction of the defendant contributed significantly to Lillie's death and that if defendant had taken the appropriate measures, there was a substantial probability that her death would not have occurred. The court also prohibited the expert psychologist from testifying that the defendant's investigation of Lillie's complaint was inadequate and that there was information available to the defendant that Deputy Braswell was unfit to carry a gun.

The determination of the admissibility of expert testimony is within the sound discretion of the trial judge and will not be disturbed on appeal absent abuse of discretion. *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984). When the jury is in as good a position as the expert to determine an issue, the expert's testimony is properly excludable because it is not helpful to the jury. *Id.* The evidence here reveals that the testimony of the criminologist would not have assisted the jury in determining whether the inaction of the defendant significantly contributed to Lillie's death and was properly excluded. Moreover, the testimony of the psychologist was excluded on the grounds of relevancy. Much of the testimony concerned prior violence, which the trial judge had already found to be inadmissible. Furthermore, the jury was in as good a position as the expert to determine whether there was sufficient data indicating Billy's fitness to carry a gun. We find no abuse of discretion in the trial court's exclusion of this testimony.

[6] Finally, plaintiff argues that the trial court erred in failing to admit evidence of prior acts of violence that would further support his claim for negligent supervision and retention. Plaintiff contends that the evidence would have established actual or con-

structive knowledge of Billy's violent propensities. The court excluded the testimony of various witnesses and unopened letters found in Billy's desk and Lillie's purse after the murder. The acts in question were too remote in time to be relevant to defendant's knowledge of Billy's current dangerous propensities. The letters that were excluded were unopened prior to Lillie's death and, therefore, were not probative evidence of defendant Tyson's knowledge. Accordingly, we find no abuse of discretion and therefore overrule this assignment of error.

Because we find in favor of defendant, we do not address defendant's evidentiary issues raised on discretionary review.

The decision of the Court of Appeals is affirmed in part, reversed in part, and the case is remanded to the Court of Appeals for further remand to Superior Court, Pitt County, for reinstatement of that court's judgment.

Affirmed in part and reversed in part and remanded.