Filed:  February 12, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 95-1149
(CA-93-147)

---

Kelly L. Dunk, etc., et al,

                                    Plaintiffs - Appellants,

        versus

United States of America,

                                    Defendant - Appellee.

---

O R D E R

---

        The Court amends its opinion filed January 30, 1996, as
follows:

        On page 2, first paragraph, line 2 -- the word "Corp" is
corrected to read "Corps."

                                    For the Court - By Direction


                                    /s/ Bert M. Montague
                            _____
                                    Clerk

UNPUBLISHED

# UNITED STATES COURT OF APPEALS

# FOR THE FOURTH CIRCUIT

KELLY L. DUNK, Estate of the
foregoing; TED BLADY,
Administrator for the estate of Kelly
L. Dunk; LUCINDA BLADY,
Administrator for the estate of Kelly

No. 95-1149

L. Dunk,
Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Chief District Judge.
(CA-93-147)

Argued: September 29, 1995

Decided: January 30, 1996

Before RUSSELL and WIDENER, Circuit Judges, and
CHAPMAN, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Ernest J. Wright, MOORE & WRIGHT, Jacksonville,
North Carolina, for Appellants. Fenita Talore Morris, Assistant

United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Stephen A. West, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

On July 17, 1990, Robert Z. Dunk, a corporal in the United States Marine Corps, fatally shot his wife, Kelly L. Dunk, and then took his own life. After this tragedy, the estate of Kelly L. Dunk sued the government under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq, for wrongful death. The district court granted summary judgment in favor of the government. We agree with the district court that the government is not responsible for Cpl. Dunk's actions and therefore affirm the decision of the district court.

I.

Corporal Robert Dunk and Kelly Dunk were married on August 15, 1985. On November 26, 1985, Cpl. Dunk enlisted in the United States Marine Corps and was stationed in Quantico, Virginia. Cpl. Dunk was an abusive husband, and he received routine counseling regarding his acts of domestic violence. While stationed at Quantico, the Dunks had two children. On December 22, 1988, the Dunks transferred to Camp Lejeune, North Carolina and were assigned family quarters in Jacksonville, North Carolina. Dunk's acts of domestic violence continued after their move, and the military police had to intervene in numerous domestic disturbances.

In June 1990, Kelly Dunk decided to leave her husband but did not tell him of her decision, fearing that he would kill her. Mrs. Dunk

2

retained an attorney and filed for divorce on June 27. She also received a protective order that prevented Cpl. Dunk from communicating with her, going to her residence, or harassing her. After the hearing on the protective order, Cpt. Swingler, Cpl. Dunk's commanding officer, ordered Dunk to stay away from his wife. He moved Cpl. Dunk into the barracks with another marine.

On July 2, 1990, Cpl. Dunk told Cpl. Jim Dabney that he intended to kill his wife. That same day, Cpl. Dunk picked up his wife after work, threatened to kill her, and drove off the military base with her. Mrs. Dunk was able to convince her husband that she would go back with him, and they returned to Camp Lejeune. Upon their arrival, Cpl. Dunk was arrested at the main gate.

Cpt. Swingler took Cpl. Dunk to the emergency room for an evaluation of his mental status. Cpl. Dunk discussed his depression and marital problems with Dr. Seneca T. Ferry, a psychologist, and Frank Lovato, Jr., a physician's assistant. Neither Ferry nor Lovato was a psychiatrist. Based on their evaluation, they released Cpl. Dunk to return to full duty. They also referred him to a psychiatrist, Dr. Boone, but Cpl. Dunk never went to his appointment with Dr. Boone.

The kidnapping prompted Mrs. Dunk to file a complaint against her husband for threatening to kill her. On July 6, 1990, a state magistrate signed a warrant for Cpl. Dunk's arrest. On July 17, 1990, Mrs. Dunk withdrew her complaint against Cpl. Dunk, and the warrant and charges were dropped. That same evening, Cpl. Dunk purchased a .44 caliber Smith & Wesson magnum pistol from Major Frank Ray King. According to Major King, Cpl. Dunk was polite and cordial when he purchased the handgun; Cpl. Dunk explained that "he and his wife shoot a lot and that they had two other pistols." After purchasing the weapon, he went to the family residence where Mrs. Dunk was doing laundry. Mrs. Dunk allowed Cpl. Dunk to enter the house.

That night, Cpl. Dunk fatally shot Mrs. Dunk twice in the head. He then shot himself, committing suicide. The killings occurred in front of the two children, Robert Z. Dunk and Theodore Z. Dunk.

In the aftermath of this tragedy, Ted and Lucinda Blady became the co-guardians of the children. On July 9, 1991, the estate filed a claim

with the Navy Legal Services Office for the wrongful death of Kelly Dunk. The Department of the Navy denied the administrative claim on May 6, 1993. Subsequently, the Bladys became the administrators of the estate.

On November 5, 1993, the Bladys, as administrators of the estate, filed this action under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., in the United States District Court for the Eastern District of North Carolina. On September 16, 1994, the government filed a motion for summary judgment. Upon receipt of the estate's brief in opposition, the district court held a telephone conference with the parties. The district court granted summary judgment in favor of the government on November 8, 1994. The estate appeals.

II.

This Court reviews de novo the district court's granting or denying of summary judgment. Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 928 (4th Cir. 1995). Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In an action against the government under the Federal Tort Claims Act, federal courts apply "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus, North Carolina law applies in this case. In order to recover in a negligence action under North Carolina law, a plaintiff must show "an actionable duty, a breach of the duty, actual and proximate causation, and damages." Cantrell v. United States, 735 F. Supp. 670, 672 (E.D.N.C. 1988) (citing Southerland v. Kapp, 295 S.E.2d 602, 603 (N.C. Ct. App. 1982)).

After reviewing the record of evidence, we conclude that the plaintiff cannot show the government or any member of the Marine Corps had an affirmative duty to take any action that would have prevented the tragedy that befell Mrs. Dunk. First, the Marine Corps medical personnel who examined Cpl. Dunk before the murder did not have a duty either to confine him or to commit him involuntarily to hospitalization. This Court has held that, under North Carolina law, psychiatrists and other mental health professionals do not have a duty to

4

involuntarily commit patients they believe to be dangerous. <u>Currie v. United States</u>, 836 F.2d 209, 212-14 (4th Cir. 1987) (holding that Veterans Administration Hospital psychiatrists had no duty to seek the involuntary commitment of a patient they believed to be dangerous, and that the psychiatrists were not negligent in failing to commit when the patient subsequently killed the plaintiff's decedent). If a trained psychiatrist, believing a patient to be dangerous, has no duty to seek the involuntary commitment of that patient, then it follows that a non-psychiatrist who is unaware of a patient's impending dangerousness should have no duty to seek the involuntary commitment of that patient. In the instant case, neither Dr. Ferry nor Mr. Lovato, both of whom examined Cpl. Dunk on July 2, 1990 when he returned to Camp Lejeune after kidnapping his wife, was a psychiatrist. Neither suspected that Cpl. Dunk harbored suicidal or homicidal intentions. Because we find that Ferry and Lovato had no duty to seek the involuntary commitment of Cpl. Dunk, we conclude that Kelly Dunk's estate cannot hold the government liable for their failure to commit Cpl. Dunk to hospitalization.

Second, we find that no member of the Marine Corps had a duty to warn Mrs. Dunk of Cpl. Dunk's potential for violence. Although neither this court nor any North Carolina court has yet to decide whether North Carolina law imposes a duty on mental health professionals to warn potential and identifiable victims of possible violence by mentally ill patients, <u>see Cantrell</u>, 735 F. Supp. at 674, we maintain that, should such a duty exist, there is no duty to warn a potential victim of another's violent behavior when the victim is already aware of the danger, <u>id</u>.; <u>Moye v. United States</u>, 735 F. Supp. 179, 181 (E.D.N.C. 1990). Cpl. Dunk had undergone several psychiatric evaluations by Marine Corps psychiatrists during his military service. The Marine Corps knew about his history of violence towards his wife. As the victim of Cpl. Dunk's violence, however, Mrs. Dunk also knew about her husband's violent tendencies. When she filed for divorce on June 27, 1990, she already feared that her husband would attempt to kill her. On July 2, Cpl. Dunk kidnapped Mrs. Dunk and threatened to kill her. Mrs. Dunk already knew of her husband's potential for violence. The Marine Corps, therefore, did not have a duty to warn her about a danger of which she was already well aware.

Third, the Marine Corps police did not have a duty to provide continual police protection to Mrs. Dunk. Under the general common law

5

rule, known as the public duty doctrine, "a municipality and its agents act for the benefit of the public, and therefore, there is no liability for the failure to furnish police protection to specific individuals." Braswell v. Braswell, 410 S.E.2d 897, 901 (N.C. 1991). However, there are two generally recognized exceptions to the public duty doctrine. A government entity has an affirmative duty to provide police protection to a particular individual where (1) a special relationship between the police and that individual exists, or (2) the police have expressly promised to protect the individual. Id. at 902.

Kelly Dunk did not fall under either exception to the public duty doctrine. She did not have a special relationship with the military police. She was merely the wife of a Marine Corps servicemember and a resident on a military base, a status no different from that of any other citizen living in military housing. The "special relationship" exception covers persons with a closer relationship to the military police, such as "state's witness[es] or informant[s] who ha[ve] aided law enforcement officers . . . ." Id. Furthermore, the military police did not expressly promise Mrs. Dunk that they would protect her from her husband. Although Mrs. Dunk had a restraining order against her husband, that order did not constitute an express promise by the military police to protect Mrs. Dunk from her husband. The restraining order simply authorized the military police to arrest Cpl. Dunk if he violated the restraining order. We therefore conclude that the military police had no duty to guard Mrs. Dunk continually to ensure that Cpl. Dunk did not harm his wife.

Fourth, the Marine Corps was not negligent merely because one of its officers, Major King, sold Cpl. Dunk the weapon he used to murder his wife and to take his own life. Assuming that the Marine Corps would be liable for Major King's negligence,* Major King did not act

_____

* If Major King were negligent in selling a firearm to Cpl. Dunk, it is not clear that the Marine Corps would be liable for Major King's action. Major King's assigned duties with the Marine Corps did not include the selling of firearms, and Cpl. Dunk was not required to have a handgun to perform his duties as a marine. The sale of the gun was simply a private transaction between Major King and Cpl. Dunk. For these reasons, the Marine Corps may not be liable for Major King's action in selling a firearm to Cpl. Dunk. We need not decide this issue, however, because we conclude that Major King did not act negligently in selling a firearm to Cpl. Dunk.

6

negligently in selling a gun to Cpl. Dunk. Although we have found no North Carolina case on the issue, courts in other states have held that sellers of firearms have a general common law duty not to sell firearms to persons who display signs of mental incompetence. Peek v. Oshman's Sporting Goods, Inc., 768 S.W.2d 841, 847 (Tex. Ct. App. 1989) (holding that sellers of firearms can be liable to third parties "where the prospective purchaser's manifest behavior or comportment have put the seller on notice that the purchaser, if possessed of a firearm, would forseeably pose a danger to third persons"); Phillips v. Roy, 431 So.2d 849, 853 (La. Ct. App. 1983) (holding that, at a minimum, "the salesperson should spend a reasonable time in observing the customer, watching carefully for any signs of mental disturbance or instability which would tend to alert the average individual to the possibility of problems in this area which would require some further inquiry"); see also Bernethy v. Walt Failor's, Inc., 653 P.2d 280, 283 (Wash. 1982); Angell v. F. Avanzini Lumber Co., 363 So.2d 571, 572 (Fl. Dist. Ct. App. 1978). Major King, however, did not notice any erratic behavior in Cpl. Dunk when he sold him the gun. Cpl. Dunk was polite and cordial, and he explained that he and his wife liked to shoot and owned two other pistols. Because Cpl. Dunk did not exhibit any erratic behavior that would have caused a reasonable person to suspect that he was mentally disturbed, Major King was not negligent in selling Cpl. Dunk a firearm.

Finally, the Marine Corps was not negligent for inadequately supervising Cpl. Dunk or for retaining Cpl. Dunk as a marine even though it knew of his history of domestic violence. Under the doctrine of respondeat superior, an employer may be liable for the wrongful acts of its employee if the employer authorized or ratified the act, or if the employee committed the act within the scope of his employment. O'Connor v. Corbett Lumber Corp., 352 S.E.2d 267, 270 (N.C. Ct. App. 1987). For wrongful acts that the employer did not authorize or ratify and that the employee did not commit within the scope of employment, "employers have been held independently liable under the doctrine of negligent hiring or retention of incompetent or unfit employees." Id.

In Braswell v. Braswell, 410 S.E.2d 897 (N.C. 1991), the North Carolina Supreme Court held that a sheriff was not liable for negligent supervision and retention of a deputy who killed his estranged

7

wife before taking his own life. In that case, the sheriff knew that the deputy had physically abused his wife in the past and that he had threatened her with a gun. However, the deputy's domestic problems did not affect his job performance as a law enforcement officer; on the job, he remained stable and even-tempered. Id. at 903-04. The court concluded that the sheriff's actions or inactions were not the proximate cause of wife's death. Id. at 904-05. According to the court, the evidence showed that the deputy "had firmly made up his mind to kill [his wife] and was willing to, and in fact intended to, give up his own life in the process. That being so clearly the case, there simply was little [that the sheriff] could have done, acting within the constraints placed upon him by law, to prevent the killing in this case." Id. at 905.

Similarly, in the instant case, the Marine Corps is not liable for Cpl. Dunk's murder of his estranged wife. Although the Marine Corps knew of Cpl. Dunk's history of violence toward his wife, his domestic problems did not affect his job performance. He performed his duties as a marine competently, and he was not otherwise violent or unstable. Furthermore, Cpt. Swingler, his superior officer, took appropriate steps to ensure that Cpl. Dunk comply with the restraining order against him. He ordered Cpl. Dunk to obey the order, and he moved Cpl. Dunk out of the family residence and into the barracks. By July 17, 1990, Cpl. Dunk had decided to murder his wife and to take his own life in the process. There was nothing that Cpt. Swingler or any other superior officer could have done to prevent the murder.

III.

We recognize that Kelly Dunk was the unfortunate victim of a terrible tragedy. But we emphasize that Cpl. Dunk was the wrongdoer, not the Marine Corps. The Marine Corps cannot be held liable for failing to prevent Cpl. Dunk from murdering his wife, an action it probably could not have prevented had it intervened further in the Dunks' affairs. For the foregoing reasons, we affirm the district court's granting of summary judgment in favor of the government.

AFFIRMED