***********
The Full Commission has reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and oral argument before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Decision and Order of Deputy Commissioner Glenn with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All the parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Tort Claims Act.
2. The parties stipulated that plaintiff's date of birth was March 13, 1961.
3. The issues to be determined from this hearing are as follows:
 a) Whether plaintiff was injured as a result of the negligence of defendant?
 b) If so, what amount, if any, damages should plaintiff recover from defendant?
4. The parties stipulated into evidence at the hearing the following:
 a) The depositions of Frank Logan and Dr. Ferrell;
5. The following was admitted into the evidence at the hearing of this matter;
 a) Plaintiff's #11(a), (b), (c) through (k) and (q) through (w),
 b) Plaintiff's #22, affidavit of Allen Moore;
 c) Plaintiff's #23, affidavit of Patricia Garey;
 d) Plaintiff's #10, June 2, 2003 letter of certification;
 e) Plaintiff's #24, affidavit of Mike Newkirk;
 f) Defendant's #1, plaintiff's deposition;
 g) Defendant's #2, pavement condition survey of 2002;
 h) Defendant's #3, Summary of pavement condition;
 i) Defendant's #4, Form DMV 349, accident report;
 j) Defendant's #5, field sketch of accident;
 k) Defendant's #6, measurements taken at the scene by Trooper Lewis; *Page 3 
 l) Defendant's #7, discovery deposition of Frank Logan.
5. Defendant's answers to interrogatories #1, 4, 9, 12, 13, 16, 18, 19, 25, 28, 29 and 31, along with the responses to the Request for Admissions # 1 through 51, excluding #43 and 44, was also made a part of the evidence in this matter.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On April 25, 2003, Plaintiff was driving home in his Dodge truck west on NC 41. It was raining and had been raining off and on all day.
2. While driving, Plaintiff could see water ponding in the road and water standing in the fields alongside the road. Due to the wheel ruts and ponding that he could see on the road, Plaintiff drove near the center of the road, hugging the centerline. While hugging the centerline another car approached Plaintiff traveling in the opposite direction. Therefore, Plaintiff moved his car to the right to avoid hitting the other car. At this point, Plaintiff hydroplaned and lost control of his truck, sending the truck off the right side of the road sideways, followed by a roll over, before landing in a ditch.
3. As a result of the accident, Plaintiff's truck was substantially damaged. He also suffered a broken cheekbone on the left side, soft tissue injury to his back, and nerve damage to his right leg.
4. After the accident, Allen Moore, who lived near the scene of the accident, came to assist Plaintiff. Mr. Moore stayed with the Plaintiff until the ambulance arrived. *Page 4 
5. Mr. Moore could not recall the rutting in the roadway where the accident occurred, though it was right in front of his house. He estimated that the ruts were probably more than 1 inch but could not say that they were several inches where Plaintiff wrecked.
6. Prior to this incident, Mr. Moore had never notified NCDOT about the rutting in the roadway even though he lived on NC 41 and had to use it each time he left and returned to his home. However, prior to this accident, Mr. Moore had called NCDOT to complain about a driveway drainage problem.
7. Jackie Royal worked for NCDOT for 38 years and retired as a Transportation Supervisor III in 2001, where his job responsibilities included responding to Sampson County citizen requests. Mr. Royal did meet with Mr. Moore in the latter part of the 1990s regarding the drainage issues he was having with his driveway. At no time did Mr. Moore complain to Mr. Royal about the rutting in the roadway on NC 41.
8. Mr. Royal is familiar with NC 41 and he does not recall ever seeing rutting 3 ½ to 6 inches deep in the area where Plaintiff had his accident or any other part. He testified that if he had observed rutting to that degree, he would have reported it to make sure that it was repaired.
9. Trooper S. B. Lewis investigated Plaintiff's accident on April 25, 2003. Trooper Lewis testified that it appeared Plaintiff lost control of his vehicle and went off the roadway. Plaintiff was cited for exceeding a safe speed for the conditions then and there existing. The District Attorney later dismissed the citation when Plaintiff produced proof that there were no other vehicles involved in the accident.
10. Trooper Lewis did not fill out a HP 320 form, which notifies NCDOT of roadway conditions contributing to an accident. Trooper Lewis has filled out an HP 320 form in other accidents. *Page 5 
11. Trooper Lewis testified that he had driven the stretch of NC 41 where Plaintiff's accident occurred prior to Plaintiff's accident and did not recall seeing ruts in the roadway 3 ½ to 6 inches deep. He did not recall seeing any condition of the roadway along this stretch that he considered a hazard. He further testified that if he had seen rutting as severe as 3 ½ to 6 inches deep or any condition he considered a hazard, he would have notified NCDOT.
12. Mike Newkirk testified that he went out on NC 41 the Monday after the accident, out of curiosity, to take the measurement of the depth of the ruts. He used an 8-foot 2x4 to measure the ruts in the roadway. He testified that his measurements showed that the ruts were approximately 3 ½ to 5 ½ inches deep.
13. Mr. Newkirk further testified that he drove on this road every day and that he never reported this condition to anyone at NCDOT.
14. Patricia Garey, the former Clerk for the town of Harrells, testified that she was aware of rutting along NC 41 prior to the time of the accident. She drafted a letter in 2003 in which she indicated that the Town of Harrells had been in "constant communication with the North Carolina Department of Transportation" since 2000. As there is not a name on the letter, a determination cannot be made as to whom the letter was addressed.
15. Ms. Garey testified that she personally spoke with Karen Fussell, NCDOT District Engineer, about the rutting in the roadway and that Ms. Fussell would tell her that there were no funds to repair the road and they were waiting for funds to come in so they could get the road repaired.
16. Ms. Fussell testified that NCDOT did not receive the 2003 letter referred to by Ms. Garey in her testimony. However, Ms. Fussell did recall one conversation with Ms. Garey *Page 6 
wherein Ms. Garey complained of rutting on NC 41 within the town limits of Harrells. However, Plaintiff's accident did not occur within the town limits of Harrells.
17. Ms. Fussell further testified that she does not specifically recall other conversations with Ms. Garey but that if such other conversations took place, she probably did tell Ms. Garey that there were no available funds at that time to repair the road.
18. Ms. Fussell also testified that if any citizen called her to complain about serious rutting in the roadway she would send someone out to investigate and make sure there was not an immediate hazard to the motoring public. If rutting 3 ½ to 6 inches deep had been found, immediate action would have been taken. However, this degree of rutting was never seen.
19. Every two years NCDOT prepares a pavement condition survey that evaluates all of the roadways in the State. A pavement condition survey evaluates conditions such as alligator cracks, bleeding, rutting, patching, etc. The purpose of the pavement condition survey is to rate the roads according to need for repair based on the various roadway conditions and to prioritize roads to obtain funding from the Division for resurfacing.
20. Rutting in the roadway is evaluated as either light, moderate or severe. A light rating is given to rutting that is 1/4 inch to less than 1/2 inch. A moderate rating is given to rutting that is 1/2 inch to less than 1 inch. A severe rating is given to rutting that is 1 inch or more.
21. Mr. McCormick and Mr. Rivenbark were employed by the defendant and one of their jobs was to inspect the roadways which included checking for rutting. When they did the pavement condition survey, Mr. McCormick would drive the truck while Mr. Rivenbark sat in the passenger side and rated the roadway conditions. Sections of the roads are evaluated in approximately two-mile increments. If either Mr. McCormick or Mr. Rivenbark had any *Page 7 
questions about the appropriate rating to assign a certain section of roadway, they would ride the stretch of road a second time and get out and take measurements.
22. In 2002, Mr. Rivenbark assigned a moderate rating to the rutting on the two-mile section of NC 41, which included the stretch of road where Plaintiff's accident occurred. In 2000, this same section of NC 41 was assigned a light rating for rutting.
23. If Mr. Rivenbark had rutting that was 1 to 2 inches deep, he would have rated the two-mile section of NC 41 as severe. Additionally, if he had seen rutting that was 3 ½ to 6 inches deep he would have immediately notified the District office to have it repaired and warning signs put in place.
24. All the experts agreed that if the rutting was from 3 ½ to 6 inches deep cars would not have been able to travel safely on the roadway, and that they would expect numerous vehicles to have bottomed out, the bottom of cars striking the surface of the roadway as they traveled along the roadway. There was no evidence of any reports of cars bottoming out, even from the witnesses that lived along or who traveled NC 41 on a regular basis.
25. The greater weight of the evidence establishes that the roadway in the area of Plaintiff's accident did have ruts in it, but they were not 3 ½ to 6 inches deep.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 8 
 CONCLUSIONS OF LAW
1. NCDOT has the statutory duty to plan, design, locate, construct, and maintain the system of public highways in this State. N.C. Gen. Stat. §§ 136-18, 136-44.1; 143B-346; DeBruhl v. State Hwy Pub. WorksComm'n, 245 N.C. 139, 95 S.E.2d 553 (1956).
2. Our Supreme Court first adopted the public duty doctrine inBraswell v. Braswell, 330 N.C. 363, 410 S.E.2d 897 (1991). The public duty doctrine was held applicable to the State Tort Claims Act inStone v. N.C. Dept. of Labor, 347 N.C. 473, 495 S.E.2d 711, cert.denied 525 U.S. 1016, 142 L.Ed.2d 449 (1998). In so doing, the Court held,
 The general common law rule provides that governmental entities, when exercising their statutory powers, act for the benefit of the general public and therefore have no duty to protect specific individuals.
Id. at 482, 495 S.E.2d at 716.
3. There are two recognized exceptions to the public duty doctrine: (1) where there is a special relationship between the injured party and the governmental entity; and when the governmental entity creates a special duty promising protection to an individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered. Id. at 482,495 S.E.2d at 717.
4. As directed in Multiple Claimants v. North Carolina Dept. ofHealth, 361 N.C. 372, 646 S.E.2d 356 (2007), the regulatory language at issue in this case is compared with the language in Stone. The NCDOT regulations in the present case create a duty to the public at large. There is no evidence in this case that indicates a special relationship between the NCDOT and Plaintiff, or a special duty to Plaintiff by NCDOT. *Page 9 
5. Under the provisions of the Tort Claims Act, negligence is determined by the same rules applicable to private parties. Bolkhir v.N.C. State University, 321 N.C. 706, 365 S.E.2d 898 (1988). To establish a negligence claim, plaintiff must show (1) a legal duty, (2) a breach of that duty, and (3) his injury was proximately caused by said breach.Stone, at 477, 495 S.E.2d at 713. NCDOT owed a duty to the general public, not to Plaintiff specifically. As there is no duty to Plaintiff, there can be no negligence.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for benefits under the North Carolina Tort Claims Act is hereby DENIED.
2. Each side shall bear its own costs
This the 29th day of February, 2008.
 S/___________________
 DANNY LEE McDONALD
 COMMISSIONER
CONCURRING:
 S/_______________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER