MULTIPLE CLAIMANTS, Plaintiffs v. NORTH CAROLINA DEPARTMENT OF HEALTH
   AND HUMAN SERVICES, DIVISION OF FACILITY SERVICES, JAILS AND
   DETENTION SERVICES, Defendant

No. COA04-808

(Filed 7 March 2006)

**1. Appeal and Error— appealability—denial of motion to dismiss—public duty doctrine—substantial right**

   Although ordinarily the denial of a motion to dismiss is an interlocutory order, defendant's appeal in an action under the Tort Claims Act arising out of a fire at a county jail is based on the public duty doctrine, and thus, involves a substantial right warranting immediate appellate review.

**2. Prisons and Prisoners; Tort Claims Act— public duty doctrine—jail inspections—private duty—special relationship**

   The public duty doctrine did not bar tort claims relating to the deaths of four inmates and serious injury to another inmate in a fire at a county jail allegedly caused by negligent inspection of the jail by an employee of defendant N.C. Department of Health and Human Services (DHHS) and negligent training of the inspector by DHHS because: (1) DHHS' duty to inspect jail conditions,

MULTIPLE CLAIMANTS v. N.C. DEP'T OF HEALTH & HUMAN SERVS.

[176 N.C. App. 278 (2006)]

expressly including those related to fire safety, is for the purpose of ensuring the safety, health, and welfare of jail inmates; (2) neither the statutes nor the regulations can be reasonably construed as creating a duty to inspect for the benefit of the public or for the public's general protection; (3) even if the Court of Appeals concluded in this case, contrary to the pertinent statutes, that a duty was owed to the general public, the public duty doctrine would still not apply unless the claim alleged a failure to detect and prevent misconduct by third parties (there has been no allegation in this case that the fire was the result of misconduct as opposed to negligence by another person); (4) most of the cases cited by the dissent involve claims against local governments and not State agencies, or address law enforcement's exercise of its duty to protect the public generally and not a duty to a specified class of individuals; (5) the statutes and regulations pertinent to DHHS' duty in this case specifically identify the particular class of persons for protection by DHHS, which is inmates of local detention facilities; (6) although DHHS and the dissent urge alternatively that the public duty doctrine should nonetheless apply based on the fact that any duty to the inmates belonged solely to the local officials, the plain language of the statutes indicate that the General Assembly has chosen to impose a duty upon the State regarding jail inmates; (7) the Court of Appeals is not free to employ a common law rule to reinstate sovereign immunity when the State has both waived that immunity and specifically assumed a duty to jail inmates; (8) even if the Court of Appeals concluded that the statutes and regulations imposed a duty to inspect for the benefit of the public, the Court of Appeals would still hold that plaintiff prisoners fall within the special relationship exception to the public duty doctrine that arises by virtue of imprisonment; (9) federal courts in other jurisdictions have held that a state's duty to ensure that a jail meets prescribed standards is sufficient to support liability under the more stringent standards of 42 U.S.C. § 1983 despite primary responsibility for the jail resting with local officials; and (10) no cases were cited, nor were any found, suggesting in any manner that causation is relevant to a determination of the applicability of the public duty doctrine.

Judge TYSON concurring in part and dissenting in part.

Appeal by defendant from order entered 19 March 2004 by the North Carolina Industrial Commission. Heard in the Court of Appeals 2 February 2005.

*Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., by Benjamin E. Baker, Jr.; Grimes & Teich, by Henry E. Teich; William Hixon; Elmore, Elmore & Williams, P.A., by Bruce A. Elmore, Jr.; C. Gary Triggs; Byrd, Byrd, Ervin, Whisnant & McMahon, P.A., by Robert K. Denton and Lawrence D. McMahon, Jr.; Anderson Law Firm, P.A., by Scott M. Anderson, for plaintiffs-appellees.*

*Attorney General Roy Cooper, by Special Deputy Attorney General David Roy Blackwell, Special Deputy Attorney General Melissa L. Trippe, Special Deputy Attorney General Amar Majmundar, and Assistant Attorney General Richard L. Harrison, for defendant-appellant.*

GEER, Judge.

Defendant North Carolina Department of Health and Human Services ("DHHS") appeals from an order of the North Carolina Industrial Commission denying its motion to dismiss based on the public duty doctrine. Plaintiffs' claims under the State Tort Claims Act arose out of a fire on 3 May 2002 at the Mitchell County jail. The fire claimed the lives of inmates Jason Jack Boston, Mark Halen Thomas, Jesse Allen Davis, and Danny Mark Johnson and seriously injured inmate O.M. Ledford, Jr. Plaintiffs contend that the inspector for DHHS was negligent in his inspection of the Mitchell County jail and that DHHS failed to properly train the inspector to perform his duties as an inspector of county jails.

Our Supreme Court has held that the public duty doctrine applies " 'to state agencies required by statute to conduct inspections *for the public's general protection.*' " *Wood v. Guilford County,* 355 N.C. 161, 167, 558 S.E.2d 490, 495 (2002) (emphasis added) (quoting *Lovelace v. City of Shelby,* 351 N.C. 458, 461, 526 S.E.2d 652, 654 (2000)). Although DHHS acknowledges that the General Assembly has placed a duty on DHHS to perform inspections of local detention facilities to ensure the health and welfare of prisoners in such facilities, it argues that these inspections "benefit the public" because "[t]he inmates addressed in these statutes are members of the public . . . ."

If we were to accept this facile argument, we would effectively eviscerate the Tort Claims Act, since State agencies would be able to argue that any duty that they owed was necessarily to a member of the public since all residents of North Carolina are members of the public. This Court must, however, be ever vigilant not to act as a

super-legislature that imposes its notion of public policy in the face of statutory determinations otherwise. It is for the General Assembly, and not judges, to decide questions of public policy regarding how and when the State may be sued.

For 100 years, North Carolina's courts have recognized that governments owe a private duty to inmates to maintain their health and safety. In connection with that duty, our General Assembly has specifically provided that DHHS has the duty to inspect local detention facilities, including jails, in order to ensure the protection of jail inmates. Since this duty is for the benefit of the inmates and not for the general public, the public duty doctrine does not apply. We, therefore, hold that the Industrial Commission properly denied DHHS' motion to dismiss.

---

Following the fire at the Mitchell County jail, plaintiffs filed separate affidavits of claim in the Industrial Commission pursuant to the Tort Claims Act, N.C. Gen. Stat. Art. 31, §§ 143-291 *et seq.* (2005). The claims of all five plaintiffs were consolidated before the Industrial Commission on 27 August 2003. Because this appeal is before us on DHHS' motion to dismiss, we treat the factual allegations in plaintiffs' affidavits of claim as true. *Hunt v. N.C. Dep't of Labor*, 348 N.C. 192, 194, 499 S.E.2d 747, 748 (1998).

Plaintiffs alleged that Ernest Dixon, a DHHS employee responsible for inspecting the Mitchell County jail, failed to adequately inspect the jail "to ensure compliance with certain regulations and to ensure that all fire safety devices and procedures were in good working order." Plaintiffs also alleged that DHHS acted negligently in "fail[ing] to properly train [Mr. Dixon] to perform the special duties of inspecting county jails for the protection of . . . inmates."

DHHS filed a motion to dismiss pursuant to N.C.R. Civ. P. 12(b)(1), (2), and (6) on the grounds that plaintiffs' claims were barred by the public duty doctrine under *Braswell v. Braswell*, 330 N.C. 363, 410 S.E.2d 897 (1991), and *Stone v. N.C. Dep't of Labor*, 347 N.C. 473, 495 S.E.2d 711, *cert. denied*, 525 U.S. 1016, 142 L. Ed. 2d 449, 119 S. Ct. 540 (1998). In response to the motion, plaintiffs amended their affidavits of claim to expressly allege that a special relationship existed between the inmates and DHHS and that DHHS owed them a special duty.

Specifically, plaintiffs alleged that because the inmates were unable to protect themselves, "a special relationship arose between

the aforementioned department and [the inmate] to fulfill the duties imposed under the law to ensure that the [inmate], as a confined individual, would be protected in the event of a fire." Plaintiffs further alleged that "the State promised it would inspect county jails to ensure the protection of inmates in the event of fires." Finally, plaintiffs asserted that "[t]he duties described hereinabove were not for the benefit of the public at large, but for the benefit of the specific individuals confined in the subject jail."

Deputy Commissioner Edward Garner, Jr. denied DHHS' motion to dismiss. DHHS appealed to the Full Commission, which upheld the Deputy Commissioner's decision. DHHS timely appealed that decision to this Court pursuant to N.C. Gen. Stat. § 143-293 (2005).

### Discussion

[1] As a preliminary matter, we note that ordinarily the denial of a motion to dismiss is an interlocutory order from which there may not be an immediate appeal. *Block v. County of Person*, 141 N.C. App. 273, 276, 540 S.E.2d 415, 418 (2000). Since, however, DHSS bases its appeal on the public duty doctrine, its appeal involves a substantial right warranting immediate appellate review. *Smith v. Jackson County Bd. of Educ.*, 168 N.C. App. 452, 457-58, 608 S.E.2d 399, 405 (2005).

[2] The sole question presented on this appeal by DHHS is whether the Commission erred when it failed to conclude that the public duty doctrine barred plaintiffs' claims. A law review commentator has cogently explained the development of the general rule:

> The public duty doctrine provides that, absent a special relationship between the governmental entity and the injured individual, the governmental entity will not be liable for injury to an individual where liability is alleged on the ground that the governmental entity owes a duty to the public in general. The doctrine has been commonly described by the oxymoron, "duty to all, duty to none." . . . .
>
> After the historic tort barrier of governmental immunity crumbled and states provided waiver mechanisms, state courts resurrected the [public duty doctrine] to provide limits to governmental tort liability when their legislatures had not done so. Thus, state courts embraced the public duty doctrine to confine liability to specific types of governmental actions, namely those not undertaken for the public in general.

**MULTIPLE CLAIMANTS v. N.C. DEP'T OF HEALTH & HUMAN SERVS.**

[176 N.C. App. 278 (2006)]

Frank Swindell, Note, *Municipal Liability for Negligent Inspections in* Sinning v. Clark—*A "Hollow" Victory for the Public Duty Doctrine,* 18 Campbell L. Rev. 241, 247-49 (1996).

Our Supreme Court specifically adopted the public duty doctrine for the first time in 1991:

> The general common law rule, known as the public duty doctrine, is that a municipality and its agents act for the benefit of the public, and therefore, there is no liability for the failure to furnish police protection to specific individuals. This rule recognizes the limited resources of law enforcement and refuses to judicially impose an overwhelming burden of liability for failure to prevent every criminal act.

*Braswell,* 330 N.C. at 370-71, 410 S.E.2d at 901 (internal citations omitted). In 1998, the Supreme Court extended this "common law rule" to certain conduct of State agencies challenged under the Tort Claims Act. *Stone,* 347 N.C. at 479, 495 S.E.2d at 715. In response to Justice Orr's vigorous dissent, the majority emphasized that this extension involved a "limited new context, not heretofore confronted by this Court." *Id.* at 483, 495 S.E.2d at 717.

Subsequently, the Supreme Court described this extension as limited to applying "the public duty doctrine to state agencies required by statute *to conduct inspections for the public's general protection.*" *Lovelace,* 351 N.C. at 461, 526 S.E.2d at 654 (emphasis added). Two years later, the Court reemphasized this limitation on the application of the public duty doctrine with respect to State agencies. *See Wood,* 355 N.C. at 167, 558 S.E.2d at 495 ("[T]his Court has extended the public duty doctrine to state agencies required by statute to conduct inspections for the public's general protection . . . ."). *See also Isenhour v. Hutto,* 350 N.C. 601, 608, 517 S.E.2d 121, 126 (1999) (noting that the public duty doctrine applies only to a violation of a "statutory duty of a state agency to inspect various facilities for the benefit of the public").

The first question we must decide, therefore, is whether the duty of inspection relied upon by plaintiffs was one "to conduct inspections for the public's general protection." *Lovelace,* 351 N.C. at 461, 526 S.E.2d at 654. If we conclude that the duty to inspect set out by the General Assembly was not "intended to benefit the public at large," *Wood,* 355 N.C. at 169, 558 S.E.2d at 496, then the public duty

doctrine does not apply. If, on the other hand, we conclude that the public duty doctrine does apply, we must next determine whether plaintiffs fall within one of the two exceptions to that doctrine:

> [E]xceptions to the doctrine exist: (1) where there is a special relationship between the injured party and the governmental entity; and (2) when the governmental entity creates a special duty by promising protection to an individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered.

*Stone*, 347 N.C. at 482, 495 S.E.2d at 717. We note that in addition to arguing that the public duty doctrine does not apply to DHHS' duty to inspect, plaintiffs also specifically alleged in their amended affidavits that both a special relationship and a special duty exist.

DHHS and the dissent contend that *Stone* and *Hunt* establish the applicability of the public duty doctrine to this case. In *Stone*, the plaintiffs sought damages for injuries or deaths resulting from the fire at the Imperial Foods Products plant in Hamlet, North Carolina. The plaintiffs alleged that the North Carolina Department of Labor had negligently failed to inspect the plant. The Supreme Court first observed: " '[A] government ought to be free to enact laws for the *public protection* without thereby exposing its supporting taxpayers . . . to liability for failures of omission in its attempt to enforce them. It is better to have such laws, even haphazardly enforced, than not to have them at all.' " *Id.* at 481, 495 S.E.2d at 716 (alteration and emphasis original) (quoting *Grogan v. Commonwealth*, 577 S.W.2d 4, 6 (Ky.), *cert. denied*, 444 U.S. 835, 62 L. Ed. 2d 46, 100 S. Ct. 69 (1979)).

The Court then turned to an assessment of the General Assembly's intent in imposing a duty of inspection on the Department of Labor:

> [T]he most the legislature intended was that the [Occupational Safety and Health] Division prescribe safety standards and secure some reasonable compliance through spot-check inspections made "as often as practicable." N.C.G.S. § 95-4(5) (1996). "In this way the safety conditions for work[ers] in general would be improved." *Nerbun v. State*, 8 Wash. App. 370, 376, 506 P.2d 873, 877 (holding that Washington Department of Labor did not owe an absolute duty to individual workers and concluding that the Washington legislature intended only that the Department act

on behalf of workers in general), *disc. rev. denied*, 82 Wash. 2d 1005 (1973).

*Id.* at 482, 495 S.E.2d at 716. The Court concluded: "Although N.C.G.S. § 95-4 imposes a duty upon defendants, *that duty is for the benefit of the public*, not individual claimants as here." *Id.* at 483, 495 S.E.2d at 717 (emphasis added).

In *Hunt*, the plaintiff alleged that the Department of Labor breached its duty to inspect amusement park rides with the result that the plaintiff was injured while riding in a go-kart with seat belts that were not in compliance with the Department's regulations. In holding that the public duty doctrine precluded the claim, the Court relied upon the fact that "[t]he Amusement Device Safety Act and the rules promulgated thereunder *are for the 'protection of the public* from exposure to such unsafe conditions' and do not create a duty to a specific individual." *Hunt*, 348 N.C. at 198, 499 S.E.2d at 751 (emphasis added) (quoting N.C. Gen. Stat. § 95-111.1(b) (1989)).

*Stone* and *Hunt* thus direct us to look at the specific statutes and regulations providing for any duty to inspect in order to determine whether the General Assembly intended the inspection to be for the protection of the general public or for the protection of specified individuals. *See Stone*, 347 N.C. at 482, 495 S.E.2d at 716 ("[W]e do not believe the legislature, in establishing the Occupational Safety and Health Division of the Department of Labor in 1973, intended to impose a duty upon this agency to each *individual* worker in North Carolina."); *Hunt*, 348 N.C. at 197, 499 S.E.2d at 750 ("[N]owhere in the [Amusement Device Safety] Act did the legislature impose a duty upon defendant to each go-kart customer.").

With respect to the inspection of jails by the State, the General Assembly has provided:

The Department [of Health and Human Services] shall:

. . . .

(3) Visit and inspect local confinement facilities; advise the sheriff, jailer, governing board, and other appropriate officials as to deficiencies and recommend improvements; and submit written reports on the inspections to appropriate local officials.

. . . .

(6) Perform any other duties that may be necessary to carry out the State's responsibilities concerning local confinement facilities.

N.C. Gen. Stat. § 153A-220 (2005). The General Assembly has more specifically provided in regards to this duty of inspection:

Department personnel *shall* visit and inspect each local confinement facility at least semiannually. *The purpose of the inspections is to investigate the conditions of confinement, the treatment of prisoners,* the maintenance of entry level employment standards for jailers and supervisory and administrative personnel of local confinement facilities as provided for in G.S. 153A-216(4), *and to determine whether the facilities meet the minimum standards published pursuant to G.S. 153A-221.* The inspector *shall* make a written report of each inspection and submit it within 30 days after the day the inspection is completed to the governing body and other local officials responsible for the facility. The report *shall* specify each way in which the facility does not meet the minimum standards.

N.C. Gen. Stat. § 153A-222 (2005) (emphases added).

The "minimum standards" against which the facilities must be measured "shall be developed with a view to providing secure custody of prisoners *and to protecting their health and welfare and providing for their humane treatment.*" N.C. Gen. Stat. § 153A-221(a) (2005) (emphasis added). *See also* N.C. Gen. Stat. § 131D-11 (2005) ("The Department of Health and Human Services *shall,* as authorized by G.S. 153-51, *inspect regularly all confinement facilities* as defined by G.S. 153-50(4) to determine compliance with the minimum standards for local confinement facilities adopted by the Social Services Commission." (emphasis added)). The importance of these inspections to the General Assembly is reflected by the fact that the legislature has made the failure to provide the information required by law to DHHS regarding local confinement facilities a Class 1 misdemeanor. N.C. Gen. Stat. § 131D-13 (2005).

DHHS' regulations adopted pursuant to these statutes provide that "[a]ll jails shall be visited and inspected at least twice each year, but a jail shall be inspected more frequently if the Department considers it necessary or if it is required by an agreement of correction pursuant to 10A NCAC 14.1304." 10A N.C.A.C. 14J.1301 (2003). DHHS requires that following the inspection, the inspector "shall forward a

copy of the inspection report to the Secretary [of DHHS] within ten days after the inspection if there are findings of noncompliance" with any of certain specified standards, including the standards for "Fire Safety." 10A N.C.A.C. 14J.1302(b)(2) (2003). After receipt of the inspector's report "[t]he Secretary shall determine whether conditions in the jail jeopardize the safe custody, safety, health or welfare of its inmates within 30 days after receipt of the inspection report and the supporting materials." 10A N.C.A.C. 14J.1303(a) (2003). If the noncompliance involves the fire plan or fire equipment, among other specified concerns, the Secretary "shall determine" that the noncompliance "jeopardizes the safe custody, safety, health or welfare of inmates confined in the jail." 10A N.C.A.C. 14J.1303(c). Once the Secretary determines that such jeopardy exists, "[t]he Secretary shall order corrective action, order the jail closed, or enter into an agreement of correction with local officials pursuant to 10A NCAC 14J.1304." 10A N.C.A.C. 14J.1303(d).

These statutes and regulations are materially distinguishable from those in *Stone* and *Hunt*. The inspection of the jail conditions— expressly including those relating to fire safety—is for the purpose of ensuring the safety, health, and welfare of jail inmates. Neither the statutes nor the regulations can be reasonably construed as creating a duty to inspect for the benefit of the public or for the public's general protection.[1]

The dissent makes no attempt to explain in what way the duty of inspection under these statutes and regulations relates to the general public apart from flatly asserting so, despite the express language otherwise. Further, in arguing that the statutes establish no duty requiring that DHHS correct any jail conditions, the dissent disregards the nature of plaintiffs' claim. Plaintiffs allege a negligent inspection of the jail and not a negligent failure to correct the conditions. There is no need to decide whether the public duty doctrine or any other theory would preclude liability for a failure to correct the conditions in the Mitchell County jail. Although not addressed by the dissent, the sole pertinent question under *Stone*, *Hunt*, and the subsequent Supreme Court decisions for such a negligent inspection claim is the purpose of the duty to inspect: whether it was for the protection of the general public or specific individuals. The General Assembly was specific in providing that the purpose of the inspection

---

1. While the inspections are also expected to assess the security of the jails— relating to the public's protection—there is no allegation in this case that DHHS was in any way negligent with respect to security.

is to protect the inmates from harm, a purpose further reflected in DHHS' regulations.[2]

DHHS' suggestion that the statutes and regulations necessarily are for the benefit of the public because "[t]he inmates addressed in these statutes are members of the public" deserves little comment. Suffice it to say that inmates are in jail specifically so that they will be separate from the general public. *See West v. Atkins*, 487 U.S. 42, 56 n.15, 101 L. Ed. 2d 40, 54 n.15, 108 S. Ct. 2250, 2260 n.15 (1988) (noting that the correctional setting is "specifically designed to be removed from the community"). *See also Wood*, 355 N.C. at 169, 558 S.E.2d at 496 (holding that the public duty doctrine applied when the "protective services provided by Guilford County were intended to benefit *the public at large*" (emphasis added)).

The view that the duty of DHHS is a private one owed to the inmate and not the general public is also supported by prior decisions of our Supreme Court. In 1992, the Supreme Court noted that "North Carolina courts and lawmakers have long recognized the state's duty to provide medical care to prisoners" and pointed out that the "legislature has codified this duty in a statute" that required the Department of Corrections to prescribe standards for health services to prisoners. *Medley v. N.C. Dep't of Corr.*, 330 N.C. 837, 842, 412 S.E.2d 654, 657-58 (1992). The statute in *Medley* is analogous to the statutes at issue in this case. As support for an additional common-law duty to inmates, the Court quoted from a 1926 decision relating

---

2. We, in any event, disagree with the dissent's construction of N.C. Gen. Stat. § 153A-223 (2005), which provides that "if the Secretary determines that conditions in the facility jeopardize the safe custody, safety, health, or welfare of persons confined in the facility, the Secretary may order corrective action or close the facility . . . ." The dissent suggests that this language means that the Secretary is not required to act. When, however, the entire statute—and not just this phrase—is considered, the plain language of the statute establishes that the Secretary is required to take action, but may choose between ordering corrective action or closing the facility. The Secretary "shall" give notice of his determination (including "the inspector's report") to the local governing body, each local official responsible for the facility, and the senior resident superior court judge for the superior court district in which the facility is located. N.C. Gen. Stat. § 153A-223(1). The governing body, if it does not initiate corrective action or close the facility, may request a contested case hearing to address (1) whether the facility meets the minimum standards, (2) whether the conditions in the facility jeopardize the safe custody, safety, health, or welfare of the inmates, and (3) the appropriate corrective action to be taken and a reasonable time to complete the action. N.C. Gen. Stat. § 153A-223(3). On appeal to the superior court, "[t]he issue before the court shall be whether the facility continues to jeopardize the safe custody, safety, health, or welfare of persons confined therein." N.C. Gen. Stat. § 153A-223(6). Thus, the statute relied upon by the dissent underscores that the duty of inspection is for the benefit of the specific individuals confined in the jail.

to jail inmates: " 'The prisoner by his arrest is deprived of his liberty for the protection of the public; it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.' " *Id.*, 412 S.E.2d at 657 (quoting *Spicer v. Williamson*, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926)). The Court concluded by also noting that "[i]n addition to common-law and statutory duties to provide adequate medical care for inmates, the state also bears this responsibility under our state Constitution and the federal Constitution." *Id.*, 412 S.E.2d at 658.

In *Spicer*, the Court held that the board of county commissioners, rather than the sheriff, was liable for payment to a doctor for a jail inmate's medical care based on the "duty which the public owes to [the sheriff's] prisoner." *Spicer*, 191 N.C. at 490, 132 S.E. at 293. The Court observed, however, that the sheriff could "be required to answer in damages to the prisoner, or upon indictment to the public" for breach of his duty to obtain medical attention for a prisoner in his custody. *Id.* The Court thus recognized both a common law duty owed directly to the prisoner in addition to his general public duty to perform his public office.

In *Levin v. Town of Burlington*, 129 N.C. 184, 188-89, 39 S.E. 822, 824 (1901), the Court specifically distinguished between duties undertaken solely for the public good and those undertaken pursuant to a duty to individuals:

> [T]hese and such cases [against municipalities] are for the neglect in failing to perform some required duty—*such as erecting and keeping in proper condition city prisons by reason whereof the health of prisoners has been seriously impaired*[,] the failure to work and keep the public streets in repair and free from obstructions, whereby some person suffers injury. These are distinguishable from the case under consideration [involving a claim of malicious prosecution], where public officers are in the exercise of a public duty, and engaged in enforcing a public law for the public good.

(Emphasis added.) *See also Shields v. Town of Durham*, 118 N.C. 450, 456, 24 S.E. 794, 795-96 (1896) (holding that the Town of Durham could be held liable when the Commissioners had failed to inspect the town prison for five years because "[t]he law will not tolerate such gross negligence as this, without holding them responsible").

The dissent dismisses the above precedent and argues that this opinion fails to apply controlling precedent of this Court. The

cases cited by the dissent, however, either are entirely consistent with the conclusion we reach today or have been overruled by the Supreme Court.

The dissent first points to *Myers v. McGrady*, 170 N.C. App. 501, 613 S.E.2d 334, *disc. review allowed*, 359 N.C. 852, 619 S.E.2d 510 (2005). In *Myers*, however, this Court specifically pointed out that "[i]n 1998, our Supreme Court applied the public duty doctrine to state agencies *required to conduct inspections for the public's general protection*," *id.* at 505, 613 S.E.2d at 338 (emphasis added)—precisely the standard we have applied in this case. *Myers*, which did not involve a failure to inspect, does not purport to alter the Supreme Court's test. Instead, *Myers* appears to hold that even if a duty to inspect for the public's general protection exists, the public duty doctrine will not apply unless the claim involves a "failure of state departments or agencies to detect and prevent misconduct of others through improper inspections." *Id.* at 507, 613 S.E.2d at 339. In other words, under *Myers*, even if we concluded in this case—contrary to the pertinent statutes—that a duty was owed to the general public, the public duty doctrine would still not apply unless the claim alleged a failure to detect and prevent misconduct by third parties. There has been no allegation here that the fire was the result of "misconduct," as opposed to negligence, by another person.

With respect to the dissent's remaining cases, with a single exception, they all involve claims against local governments and not State agencies. Those cases addressing negligent inspection claims or conduct not involving law enforcement departments acting to protect the public have been overruled by *Thompson v. Waters*, 351 N.C. 462, 465, 526 S.E.2d 650, 652 (2000), and *Lovelace*, 351 N.C. at 461, 526 S.E.2d at 654.[3] Specifically, in *Thompson*, the Court held: "This Court has not heretofore applied the public duty doctrine to a claim against a municipality or county in a situation involving any group or individual other than law enforcement. After careful review of appellate decisions on the public duty doctrine in this state and other jurisdic-

---

3. These cases include *Simmons v. City of Hickory*, 126 N.C. App. 821, 487 S.E.2d 583 (1997) (addressing a city's negligent inspection of a home); *Tise v. Yates Constr. Co.*, 122 N.C. App. 582, 471 S.E.2d 102 (1996) (involving a city's failure to inform a construction company of potential tampering with equipment, resulting in the death of a police officer), *modified and aff'd on other grounds*, 345 N.C. 456, 460, 480 S.E.2d 677, 680 (1997) ("We have some doubt as to the applicability of the public duty doctrine to the circumstances of this case."); *Sinning v. Clark*, 119 N.C. App. 515, 459 S.E.2d 71 (involving negligent inspection of a home), *disc. review denied*, 342 N.C. 194, 463 S.E.2d 242 (1995).

tions, we conclude that the public duty doctrine does not bar this claim against Lee County for negligent inspection of plaintiffs' private residence." 351 N.C. at 465, 526 S.E.2d at 652. *See also Lovelace*, 351 N.C. at 461, 526 S.E.2d at 654 ("[W]e have never expanded the public duty doctrine to any local government agencies other than law enforcement departments when they are exercising their general duty to protect the public.").

The remaining cases cited by the dissent address law enforcement's exercise of its duty to protect the public generally and not a duty to a specified class of individuals.[4] Indeed, this Court in *Clark v. The Red Bird Cab Co.*, 114 N.C. App. 400, 406, 442 S.E.2d 75, 78, *disc. review denied*, 336 N.C. 603, 447 S.E.2d 387 (1994), stressed: "Here, a review of the applicable city code provisions reveals no specific identification of a particular class of persons being singled out for protection by the city. We find no language creating a special duty which the police officers would owe to taxicab customers over and above the duty owed to the general public." By contrast, the statutes and regulations pertinent to DHHS' duty in this case do specifically identify a particular class of persons for protection by DHHS: inmates of local detention facilities. Further, in *Lassiter*, this Court specifically recognized that *Lovelace* "sought to reign [sic] in the expansion of the public duty doctrine's application to other government agencies and ensure it would be applied in the future only to law enforcement agencies fulfilling their 'general duty to protect the public,' and thus reasserted the principles of *Braswell*." 168 N.C. App. at 317, 607 S.E.2d at 692 (quoting *Lovelace*, 351 N.C. at 461, 526 S.E.2d at 654). In short, the cases cited by the dissent either support the analysis we have applied in this case or are inapplicable.

DHHS and the dissent urge alternatively that the public duty doctrine should nonetheless apply because any duty to the inmates

4. *See Lassiter v. Cohn*, 168 N.C. App. 310, 607 S.E.2d 688 (applying public duty doctrine to the discretionary actions of a police officer responding to an accident scene), *disc. review denied*, 359 N.C. 633, 613 S.E.2d 686 (2005); *Little v. Atkinson*, 136 N.C. App. 430, 432, 524 S.E.2d 378, 380 (relying upon the principle that "there is no liability for failure to furnish police protection to specific individuals" when the police are exercising their general police powers), *disc. review denied*, 351 N.C. 474, 543 S.E.2d 492 (2000); *Vanasek v. Duke Power Co.*, 132 N.C. App. 335, 337, 511 S.E.2d 41, 43 (involving police officers' failure to provide warning to the public of a downed power line; to the extent the holding applied the public duty doctrine to claims against the City and fire department, it was overruled by *Lovelace*), *cert. denied*, 350 N.C. 851, 539 S.E.2d 13 (1999); *Humphries v. N.C. Dep't of Corr.*, 124 N.C. App. 545, 479 S.E.2d 27 (1996) (applying doctrine to probation officer's negligent failure to prevent convict from committing criminal acts against members of the public), *disc. review improvidently allowed*, 346 N.C. 269, 485 S.E.2d 293 (1997).

belonged solely to the local officials. As the plain language of the statutes indicate, however, the General Assembly has chosen to impose a duty upon the State regarding jail inmates.[5] *Medley, Spicer, Levin,* and *Shields* establish that when a governmental body has a duty regarding the care of an inmate, that duty is a private one owed to the inmate and not a public duty. By assuming a duty to jail inmates, the General Assembly assumed a private duty to those individuals, and the public duty doctrine does not apply. This holding is in accord with that of other states. *See Roberts v. State,* 159 Ind. App. 456, 462, 307 N.E.2d 501, 505 (1974) ("[A] public official, charged with the custody and care of a prisoner, owes a *private duty* to the prisoner to take reasonable precautions under the circumstances to preserve his life, health, and safety—a duty which is in addition to the duty of safekeeping owed to the public generally."); *Geiger v. Bowersox,* 974 S.W.2d 513, 517 (Mo. Ct. App. 1998) (holding that a nurse at a prison "does not owe the general public" a duty, but rather her duty is "owed specifically to the inmates").

While the Supreme Court in *Stone* stated that it "refuse[d] to judicially impose an overwhelming burden of liability on defendants for failure to prevent every employer's negligence that results in injuries or deaths to employees," 347 N.C. at 481, 495 S.E.2d at 716, the duty in this case is legislatively imposed. In contrast to *Stone* and *Hunt,* the statutes relied upon by plaintiffs in this case do not seek to secure only "reasonable compliance through spot-check inspections made 'as often as practicable.'" *Id.* at 482, 495 S.E.2d at 716 (quoting N.C. Gen. Stat. § 95-4(5) (1996)). Instead, they specifically require two inspections a year of each local detention facility with the intent that *total compliance* will be achieved with respect to certain standards such as fire safety—the very standards at issue here.

We are not free to employ a common law rule to reinstate sovereign immunity when the State has both waived that immunity and specifically assumed a duty to jail inmates. The dissent's claim that this opinion "has far reaching implications" is misplaced. Each of the examples given by the dissent—such as a restaurant patron, a patient, or a legal client—involves the general public. They do not involve the

---

5. The federal case cited by DHHS and the dissent supports the existence of this duty. *See Reid v. Johnston County,* 688 F. Supp. 200, 202 (E.D.N.C. 1988) ("There is no question that the North Carolina legislature has contemplated some state participation in the maintenance and operation of local confinement facilities."), *aff'd per curiam sub nom. Reid v. Kayye,* 885 F.2d 129, 131 (4th Cir. 1989) (noting that under North Carolina law, the Department "has the duty" both to develop minimum standards and to inspect each facility).

unique situation faced by inmates and the express assumption by the State of a duty to those inmates. Indeed, if we were to embrace the view of the dissents in this case and in *Myers*, it is difficult to identify any negligence claim asserted against the State that would fall outside the scope of the public duty doctrine. The result would be to judicially amend the State Tort Claims Act to require all plaintiffs to prove either a special relationship or a special duty as an element of their claim under the Tort Claims Act. To do so—based on a judicial assessment of the policy implications for the State and its taxpayers—would be to sit as a super-legislature.[6]

Even if we could conclude that the statutes and regulations imposed a duty to inspect for the benefit of the public, as required by *Stone* and *Hunt*, we would still hold that plaintiffs fall within the "special relationship" exception to the public duty doctrine. In *Hunt*, the Supreme Court explained that "in order to fall within the 'special relationship' exception to the public duty doctrine, plaintiff must allege a special relationship, such as that between 'a state's witness or informant who has aided law enforcement officers.' " 348 N.C. at 199, 499 S.E.2d at 751 (quoting *Braswell*, 330 N.C. at 371, 410 S.E.2d at 902).[7]

This Court has previously held that a "special relationship" exists when the plaintiff is in police custody. *Hull v. Oldham*, 104 N.C. App. 29, 38, 407 S.E.2d 611, 616 ("[T]here are exceptions to the general rule of no liability where a special relationship exists between the victim and law enforcement, such as where the victim is in police custody . . . ."), *disc. review denied*, 330 N.C. 441, 412 S.E.2d 72 (1991). *See also Stafford v. Barker*, 129 N.C. App. 576, 582, 502 S.E.2d 1, 5 (utilizing same quotation from *Hull* as an illustration of the type of circumstances that give rise to a special relationship), *disc. review denied*, 348 N.C. 695, 511 S.E.2d 650 (1998). For the purpose of the public duty doctrine, there is no meaningful distinction between a person who is in police custody and a person who is in the custody of the jail because of the State's decision to prosecute him.

In a context analogous to that of the public duty doctrine, our courts have held there is no duty to protect others against harm from

6. Contrary to the dissent's suggestion, the General Assembly had no need to respond to *Braswell* because it did not involve the State. Further, *Stone* and *Hunt* provide only narrow exceptions to State liability under the Tort Claims Act.

7. As analyzed in *Stone* and *Hunt*, there appears, in the context of negligent inspection cases, to be considerable overlap between the first inquiry—whether the duty is for the protection of the public—and the "special relationship" exception.

third persons except "when a special relationship exists between parties." *King v. Durham County Mental Health Developmental Disabilities & Substance Abuse Auth.*, 113 N.C. App. 341, 345, 439 S.E.2d 771, 774, *disc. review denied*, 336 N.C. 316, 445 S.E.2d 396 (1994). In *King*, this Court observed that "recognized special relationships" include "custodian-prisoner." *Id.* at 346, 439 S.E.2d at 774. *See also Haworth v. State*, 60 Haw. 557, 563, 592 P.2d 820, 824 (1979) ("It is well settled that a state, by reason of the special relationship created by its custody of a prisoner, is under a duty to the prisoner to take reasonable action to protect the prisoner against unreasonable risk of physical harm."); Restatement (Second) of Torts § 314A(4) (1965) ("One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."); *id.* cmt. b ("The duties stated in this Section arise out of special relations between the parties, which create a special responsibility, and take the case out of the general rule.").

Similarly, in *Davidson v. Univ. of N.C. at Chapel Hill*, 142 N.C. App. 544, 554, 543 S.E.2d 920, 927, *disc. review denied and cert. denied*, 353 N.C. 724, 550 S.E.2d 771 (2001), this Court considered when a "special relationship" exists for purposes of imposing liability under the State Tort Claims Act for a negligent omission. The Court explained:

> "During the last century, liability for [omissions] has been extended still further to a limited group of relations, in which custom, public sentiment and views of social policy have led the courts to find a duty of affirmative action. In such relationships the plaintiff is typically in some respect particularly vulnerable and dependant upon the defendant who, correspondingly, holds considerable power over the plaintiff's welfare. In addition, such relations have often involved some existing or potential economic advantage to the defendant. Fairness in such cases thus may require the defendant to use his power to help the plaintiff, based upon the plaintiff's expectation of protection, which itself may be based upon the defendant's expectation of financial gain. . . . There is now respectable authority imposing the same duty upon a shopkeeper to his business visitor, upon a host to his social guest, *upon a jailor to his prisoner*, and upon a school to its pupil."

*Id.*, 543 S.E.2d at 926-27 (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 56, at 373-74, 376-77 (5th ed. 1984) (emphasis added and omitted)).

The United States Supreme Court has also recognized the special relationship that arises by virtue of imprisonment: "prisons and jails are inherently coercive institutions that for security reasons must exercise nearly total control over their residents' lives and the activities within their confines . . . ." *West*, 487 U.S. at 56 n.15, 101 L. Ed. 2d at 54 n.15, 108 S. Ct. at 2260 n.15. Accordingly,

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200, 103 L. Ed. 2d 249, 261-62, 109 S. Ct. 998, 1005-06 (1989) (internal citations omitted).

Although not disputing that inmates may fall within the "special relationship" exception, DHHS and the dissent argue that it had no "special relationship" with the inmates because any such relationship was between Mitchell County and the inmates. In doing so, DHHS and the dissent ignore the express responsibility mandated by the General Assembly and implemented in DHHS' own regulations. Federal courts in other jurisdictions have held that a state's duty to ensure that a jail meets prescribed standards is sufficient to support liability under the more stringent standards of 42 U.S.C. § 1983 despite primary responsibility for the jail resting with local officials. *See, e.g., Nicholson v. Choctaw County*, 498 F. Supp. 295, 311 (S.D. Ala. 1980) ("The Commissioner of the Department of Corrections has violated the rights of inmates held in Choctaw County Jail by failing to exercise his duty under Alabama law to insure that the jail meets

the standards prescribed pursuant to Alabama Code § 14-6-81."); *Payne v. Rollings*, 402 F. Supp. 1225, 1228 (E.D. Va. 1975) (holding, based on state statutes requiring the Director of the Department of Corrections to enforce regulations regarding jails, that the defendant Director "did owe a duty to plaintiff," who was a jail inmate, that would support a claim under § 1983).

The district court and Fourth Circuit decisions in *Reid v. Johnston County*, 688 F. Supp. 200 (E.D.N.C. 1988), *aff'd per curiam sub nom. Reid v. Kayye*, 885 F.2d 129 (4th Cir. 1989), relied upon by DHHS, do not lead to a different conclusion. Neither court addressed state negligence claims, but rather only considered the liability of individual State officials under 42 U.S.C. § 1983 for "fail[ing] to take action to remedy the [constitutional] violations" arising out of conditions in the county jail. 885 F.2d at 131. The plaintiffs argued in *Reid* that the State officials "had not only the power but the duty to correct the conditions." *Id.* Although the Fourth Circuit acknowledged that, by statute, the State had a duty toward the jail inmates, it concluded that the statutes did not vest the officials "with the mandatory duty to remedy substandard jail conditions" and, in the absence of such a duty, "their inaction cannot be seen as a cause of those conditions and a § 1983 suit cannot be maintained against them." *Id. See also Reid*, 688 F. Supp. at 203 (granting the motion to dismiss the § 1983 action because "plaintiffs have not demonstrated that defendants' actions, taken under color of state law, have in any way *caused* existing or past constitutionally deficient conditions"). Thus, neither case disputed the existence of a "special relationship" between jail inmates and DHHS, but rather only addressed the issue of causation under § 1983.

The issue of causation is not, however, before this Court.[8] DHHS and the dissent have cited no cases suggesting in any manner that

8. Nothing precludes DHHS from challenging below plaintiffs' ability to prove the causation alleged in their affidavits of claim. We express no opinion regarding the conclusions reached by the federal courts in *Reid* as to the discretionary nature of DHHS' ability to enforce its standards. We note, however, that the courts did not address DHHS' regulations. *See* 10A N.C.A.C. 14J.1303(a) ("The Secretary shall determine whether conditions in the jail jeopardize the safe custody, safety, health or welfare of its inmates within 30 days after receipt of the inspection report and the supporting materials."); 10A N.C.A.C. 14J.1303(c) (mandating that the Secretary "shall determine" that noncompliance with certain standards, including those relating to fire safety, jeopardize the safe custody, safety, health, or welfare of inmates); 10A N.C.A.C. 14J.1303(d) (providing that "[t]he Secretary shall order corrective action, order the jail closed, or enter into an agreement of correction with local officials pursuant to 10A NCAC 14J.1304").

causation is relevant to a determination of the applicability of the public duty doctrine. Nor have we identified any. We, therefore, hold, based on the statutes discussed above, that plaintiffs have sufficiently demonstrated that they fall within the "special relationship" exception to the public duty doctrine.

### Conclusion

We hold that the public duty doctrine does not apply under *Stone* and *Hunt* because DHHS' duty to inspect was for the purpose of protecting the inmates and not for protection of the public generally. Alternatively, we hold that, even if the public duty doctrine did apply, plaintiffs fall within the "special relationship" exception to that doctrine. Accordingly, we affirm the Industrial Commission's denial of DHHS' motion to dismiss.

Affirmed.

Judge McGEE concurs.

Judge TYSON concurs in part and dissents in part in a separate opinion.

TYSON, Judge, concurring in part, dissenting in part.

I agree that defendant's appeal, although interlocutory, asserts a substantial right and is properly before this Court. *Smith v. Jackson County Bd. of Educ.*, 168 N.C. App. 452, 608 S.E.2d 398 (2005).

The majority's opinion then affirms the Industrial Commission's denial of DHHS' motion to dismiss and holds the public duty doctrine does not apply to the facts at bar. In the alternative, the majority's opinion holds DHHS had a "special relationship" to plaintiffs to except plaintiff's claims from the public duty doctrine. Precedents construing and applying the public duty doctrine clearly control and require dismissal of this case. No "special relationship" exists between plaintiffs and DHHS to except DHHS from the public duty doctrine. I respectfully dissent.

### I. Public Duty Doctrine

The public duty doctrine "provides that governmental entities and their agents owe duties *only to the general public*, not to individuals, absent a 'special relationship' or 'special duty' between the entity and the injured party." *Stone v. N.C. Dept. of Labor*, 347 N.C.

473, 477-78, 495 S.E.2d 711, 714 (1998) (emphasis supplied); *see also Wood v. Guilford Cty.*, 355 N.C. 161, 167, 558 S.E.2d 490, 495 (2002) (". . . this Court has extended the public duty doctrine to state agencies required by statute to conduct inspections for the public's general protection . . . ").

Our Supreme Court recognized the common law public duty doctrine as an exception to the Tort Claims Act for municipalities, political subdivisions, and their agents in *Braswell v. Braswell*, 330 N.C. 363, 370-71, 410 S.E.2d 897, 901 (1991) (involving a county sheriff's alleged negligence in protecting a citizen). In *Stone*, our Supreme Court extended the scope of the public duty doctrine to "state agencies" and "governmental functions other than law enforcement." 347 N.C. at 481, 495 S.E.2d at 716.

Our Supreme Court also stated exceptions to the application of the public duty doctrine: (1) where the plaintiff shows a "special relationship" between the injured party and the governmental entity; or, (2) when the governmental entity creates a "special duty" by promising protection to an individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered. *Braswell*, 330 N.C. at 371, 410 S.E.2d at 902. These exceptions are to be narrowly applied. *Id.* at 372, 410 S.E.2d at 902.

In *Braswell*, our Supreme Court held the public duty doctrine was necessary to prevent "an overwhelming burden of liability" on governmental agencies with "limited resources." *Id.* at 370-71, 410 S.E.2d at 901. The Court stated:

> The amount of protection that may be provided is limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed. For the courts to proclaim a new and general duty of protection in the law of tort . . . would inevitably determine how the limited [public] resources . . . should be allocated and without predictable limits.

*Id.* at 371, 410 S.E.2d at 901-02 (*quoting Riss v. City of New York*, 22 N.Y.2d 579, 581-82, 240 N.E.2d 860, 860-61, 293 N.Y.S.2d 897, 898 (1968)).

In *Myers v. McGrady*, 170 N.C. App. 501, 507, 613 S.E.2d 334, 339 (2005), this Court recently held "that the public duty doctrine applies where plaintiffs allege negligence through (a) failure of law

enforcement to provide protection from the misconduct of others, and (b) *failure of state departments or agencies to detect and prevent misconduct of others through improper inspections.*" (Emphasis supplied). The facts before us clearly fall into the second category.

## II.  Controlling Precedents

This case cannot be distinguished from controlling Supreme Court decisions in *Stone* and *Hunt v. N.C. Dept. of Labor*, 348 N.C. 192, 499 S.E.2d 747 (1998). We are bound by the decisions of our Supreme Court. *Eaves v. Universal Underwriters Group*, 107 N.C. App. 595, 600, 421 S.E.2d 191, 194 (1992), *disc. review denied*, 333 N.C. 167, 424 S.E.2d 908 (1992).

The result here is also controlled by this Court's prior precedents in *Myers*; *Lassiter v. Cohn*, 168 N.C. App. 310, 607 S.E.2d 688 (2005) (the public duty doctrine barred the plaintiff's claims against the city when, after a traffic accident, a city police officer asked the plaintiff to walk to the rear of his vehicle and the plaintiff was struck by a car); *Little v. Atkinson*, 136 N.C. App. 430, 433-34, 524 S.E.2d 378, 381 (the public duty doctrine barred claims against the city and its police officers who failed to adequately inspect a crime scene before allowing relatives of the victim to visit the site), *disc. rev. denied*, 351 N.C. 474, 543 S.E.2d 492 (2000); *Vanasek v. Duke Power Co.*, 132 N.C. App. 335, 340-41, 511 S.E.2d 41, 45 (the public duty doctrine barred claims against the city and its police officers who failed to warn the public of broken power lines that caused decedent's death), *cert. denied*, 350 N.C. 851, 539 S.E.2d 13 (1999); *Simmons v. City of Hickory*, 126 N.C. App. 821, 823-25, 487 S.E.2d 583, 586 (1997) (the public duty doctrine barred a claim against the city for negligently inspecting homes and issuing building permits); *Humphries v. N.C. Dept. of Correction*, 124 N.C. App. 545, 547-48, 479 S.E.2d 27, 28 (1996) (the public duty doctrine barred claim against the Department of Correction for alleged negligence in the supervision of a probationer), *disc. rev. improvidently allowed*, 346 N.C. 269, 485 S.E.2d 293 (1997); *Tise v. Yates Construction Co.*, 122 N.C. App. 582, 588-89, 471 S.E.2d 102, 107 (1996) (the public duty doctrine shielded city from liability for its failure to inform construction company of potential tampering of construction equipment by trespassers where decedent died after construction equipment crushed him); *Sinning v. Clark*, 119 N.C. App. 515, 518-20, 459 S.E.2d 71, 73-74 (the public duty doctrine applied to bar a claim against the city, the city building inspector, and

the city code administrator for gross negligence in an inspection of a home), *disc. rev. denied,* 342 N.C. 194, 463 S.E.2d 242 (1995); *Clark v. Red Bird Cab Co.,* 114 N.C. App. 400, 406, 442 S.E.2d 75, 78 (1994) (the public duty doctrine protected the municipality and its police officers who negligently issued a taxicab permit to a driver who subsequently murdered a customer); *Prevette v. Forsyth County,* 110 N.C. App. 754, 758, 431 S.E.2d 216, 218 (the public duty doctrine barred a wrongful death claim against the county and against the director and an employee of the county animal control shelter for failing to protect plaintiff from dogs which defendants knew were dangerous), *disc. review denied,* 334 N.C. 622, 435 S.E.2d 338 (1993). We are also bound by this Court's prior precedents. *In re Civil Penalty,* 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). Nothing in *Thompson* or *Lovelace,* cited in the majority's opinion, expressly overrules the precedents cited above.

### A. *Stone v. N.C. Dept. of Labor*

In *Stone,* the plaintiffs sued the North Carolina Department of Labor and its Occupational Safety and Health Division ("DOL") under the Tort Claims Act seeking damages for injuries or deaths resulting from a fire at the Imperial Foods Products plant in Hamlet, North Carolina. 347 N.C. at 476, 495 S.E.2d at 713. Subsequent to the fire, DOL conducted an inspection of the plant. This was the only inspection DOL had conducted during the plant's eleven-year history of operation. *Id.* at 477, 495 S.E.2d at 713. As a result of the inspection, DOL discovered inadequate and blocked exits and an inadequate fire suppression system. *Id.*

As here, the Industrial Commission in *Stone* denied the State's Rule 12(b)(1) and 12(b)(6) motions. The Court of Appeals in *Stone* unanimously affirmed the Commission. *Id.* at 476, 495 S.E.2d at 713. Our Supreme Court granted discretionary review and reversed and remanded. Justice Whichard wrote:

> Just as we recognized the limited resources of law enforcement in *Braswell,* we recognize the limited resources of defendants here. Just as we there refused to judicially impose an overwhelming burden of liability on law enforcement for failure to prevent every criminal act, we now refuse to judicially impose an overwhelming burden of liability on defendants for failure to prevent every employer's negligence that results in injuries or deaths to employees. A government ought to be free to enact laws for the *public protection* without thereby exposing its supporting tax-

payers . . . to liability for failures of omission in its attempt to enforce them. It is better to have such laws, even haphazardly enforced, than not to have them at all.

*Stone,* 347 N.C. at 481, 495 S.E.2d at 716 (internal citations and quotation marks omitted) (emphasis in original).

Similar to plaintiffs' claims here, the plaintiffs in *Stone* argued the state agency owed them an individualized duty under N.C. Gen. Stat. § 95-4(5) to inspect the plant. *Id.* at 483, 495 S.E.2d at 717. "This statute provides that the Commissioner of Labor is 'charged with the duty' to visit and inspect 'at reasonable hours, as often as practicable,' all of the 'factories, mercantile establishments, mills, workshops, public eating places, and commercial institutions in the State.' *Id.* (quoting N.C. Gen. Stat. § 95-4(5)). The Court held the individual claimants could not recover against the State because the duty imposed by this statute is for the benefit of the general public and not for the benefit of an individual. *Id.* The Court stated:

> [W]e do not believe the legislature, in establishing the Occupational Safety and Health Division of the Department of Labor in 1973, intended to impose a duty upon this agency to each *individual* worker in North Carolina. Nowhere in chapter 95 of our General Statutes does the legislature authorize a private, individual right of action against the State to assure compliance with OSHANC standards. Rather, the most the legislature intended was that the Division prescribe safety standards and secure some reasonable compliance through spot-check inspections made "as often as practicable." N.C.G.S. § 95-4(5) (1996). "In this way the safety conditions for workers in general would be improved." *Nerbun v. State,* 8 Wash. App. 370, 376, 506 P.2d 873, 877.

*Id.* at 482, 495 S.E.2d at 716 (internal citations and quotation marks omitted).

### B. *Hunt v. N.C. Dept. of Labor*

In *Hunt,* decided a year after *Stone,* the plaintiff also sued DOL under the Tort Claims Act for injuries resulting from an accident at an amusement park. *Id.* The plaintiff argued DOL "had a duty under the Amusement Device Safety Act, chapter 95, article 14B of the North Carolina General Statutes, and the rules and regulations promulgated thereunder in the Administrative Code," and the DOL breached this duty by failing to inform the amusement park's manager that, pursuant to Rule .0429(a)(3)(B) of the Administrative Code, shoulder

straps and seat belts must be mounted on go-karts. *Id.* at 195, 499 S.E.2d at 748-49. The Commission again denied the State's Rule 12(b)(1) and 12(b)(6) motions and the Court of Appeals affirmed. *Id.* at 194, 499 S.E.2d at 748.

Our Supreme court reviewed the Amusement Device Safety Act and again reversed the Court of Appeal's affirmance and remanded. Justice (now Chief Justice) Parker wrote, "nowhere in the Act did the legislature impose a duty upon defendant to each go-kart customer." *Id.* at 197, 499 S.E.2d at 750. The Court further stated, "Pursuant to N.C.G.S. § 95-111.4, the Commissioner of Labor has promulgated rules governing the inspection of go-karts. 13 NCAC 15 .0400 (June 1992). These rules similarly do not impose any such duty." *Id.* The Court held that the rules promulgated under the Amusement Device Safety Act "are for the '[p]rotection of the public from exposure to such unsafe conditions' and do not create a duty to a specific individual." *Id.* at 198, 499 S.E.2d at 751. "To hold contrary to our holding in *Stone*, in which we held that the defendants' failure to inspect did not create liability, would be tantamount to imposing liability on defendant in this case solely for inspecting the go-karts and not discovering them to be in violation of the Code." *Id.* at 198-99, 499 S.E.2d at 751.

### III.  Analysis

The facts at bar fit squarely within the law set forth in *Stone* and *Hunt* and other binding precedents cited above. *Stone* and *Hunt* mandate that the public duty doctrine bars negligence claims against the State where the State legislatively imposes a duty to inspect to protect the public generally. Here, none of the applicable statutes before us impose any duty on or require the State to protect any individual claimant, nor do the statutes establish any special relationship between plaintiffs and DHHS.

### A.  Public, Not Private, Duty

The North Carolina General Assembly authorized Mitchell County to establish and maintain a county confinement facility. N.C. Gen. Stat. § 153A-218 (2003) ("A county may establish, acquire, erect, repair, maintain, and operate local confinement facilities and may for these purposes appropriate funds not otherwise limited as to use by law."). The General Assembly also recognized the Sheriff of Mitchell County bears the responsibility for the care and custody of the jail and its inmates. N.C. Gen. Stat. § 162-22 (2003) ("The sheriff shall

have the care and custody of the jail in his county; and shall be, or appoint, the keeper thereof.") These statutes clearly show the Legislature's intent to place the responsibility of and liability for the care and custody of detainees housed in local jails on Mitchell County and its sheriff, not the State. *Id.*

Further, under N.C. Gen. Stat. § 153A-216, "Legislative Policy", the General Assembly provided:

The policy of the General Assembly with respect to local confinement facilities is:

(1) *Local confinement facilities should provide secure custody of persons confined therein in order to protect the community* and should be operated so as to protect the health and welfare of prisoners and provide for their humane treatment.

(2) Minimum statewide standards should be provided to *guide and assist local governments* in planning, constructing, *and maintaining* confinement facilities and in developing programs that provide for humane treatment of prisoners and contribute to the rehabilitation of offenders.

(3) The State *should* provide services to *local governments* to *help improve* the quality of administration and local confinement facilities. These services should include inspection, consultation, technical assistance, and other appropriate services.

(4) Adequate qualifications and training of the personnel of local confinement facilities are essential to improving the quality of these facilities. The State shall establish entry level employment standards for jailers and supervisory and administrative personnel of *local confinement facilities* to include training as a condition of employment in a local confinement facility pursuant to the provisions of Chapter 17C and Chapter 17E and the rules promulgated thereunder.

N.C. Gen. Stat. § 153A-216 (2003) (emphasis supplied).

Under this statute, the General Assembly's expressed intent is that defendant's public duty is clearly for the benefit of the public. *Id.* ("Local confinement facilities should provide secure custody of persons confined therein in order to protect the community"). Also, under this statute, the State "should provide services to local governments to help improve the quality of administration and local confinement facilities. These services should include inspection, consul-

tation, technical assistance, and other appropriate services." This language reinforces the legislative intent that defendant's role in providing statewide minimum standards and bi-annual inspections of local jails is for the benefit of the public and not for these individual claimants. This statute clearly does not impose either the categorical or derivative responsibility on the State to ensure county jail facilities comply with certain regulations or to create any liability to any individual for its failure to do so. N.C. Gen. Stat. § 153A-221 required DHHS to "develop and publish minimum standards for the operation of local confinement facilities." The standards must provide:

(1) Secure and safe physical facilities;

(2) Jail design;

(3) Adequacy of space per prisoner;

(4) Heat, light, and ventilation;

(5) Supervision of prisoners;

(6) Personal hygiene and comfort of prisoners;

(7) Medical care for prisoners, including mental health, mental retardation, and substance abuse services;

(8) Sanitation;

(9) Food allowances, food preparation, and food handling;

(10) Any other provisions that may be necessary for the safekeeping, privacy, care, protection, and welfare of prisoners.

N.C. Gen. Stat. § 153A-221(a) (2003). This statute imposes no affirmative duty on the State to ensure the safety of individual detainees housed in county jails.

N.C. Gen. Stat. § 153A-222, "Inspections of local confinement facilities" provides in pertinent part:

Department personnel shall visit and inspect each local confinement facility at least semiannually. The purpose of the inspections is to investigate the conditions of confinement, the treatment of prisoners, the maintenance of entry level employment standards for jailers and supervisory and administrative personnel of *local confinement facilities* as provided for in G.S. 153A-216(4), and to determine whether the facilities meet the minimum standards published pursuant to G.S. 153A-221. The

inspector shall make a written report of each inspection and submit it within 30 days after the day the inspection is completed *to the governing body and other local officials* responsible for the facility. The report shall specify each way in which the facility does not meet the minimum standards. *The governing body shall consider the report at its first regular meeting after receipt of the report and shall promptly initiate any action necessary to bring the facility into conformity with the standards.*

N.C. Gen. Stat. § 153A-222 (2003) (emphasis supplied). In the Tort Claims Act, the legislature clearly did not intend to impose liability on the State for injuries or deaths sustained by detainees in local confinement facilities with allegedly inadequate safety measures. Under the statute, the local governing body, and not the State, is charged with the duty to bring the facility into conformity with and maintain the standards. This statute also demonstrates the Legislature's intent that the State's role in county jails is limited to inspect and report on county correctional facilities to the county governing authorities for the benefit of the public generally. *Id.*

Further, N.C. Gen. Stat. § 153A-223 (2003), "Enforcement of Minimum Standards," shows the State is not liable for claims of detainees in local jails. The statute provides:

If an inspection conducted pursuant to G.S. 153A-222 discloses . . . that a local confinement facility does not meet the minimum standards published pursuant to G.S. 153A-221 and, in addition, if the Secretary determines that conditions in the facility jeopardize the safe custody, safety, health, or welfare of persons confined in the facility, the Secretary *may* order corrective action or close the facility, as provided in this section . . . [.]

*Id.* (emphasis supplied). The United States Court of Appeals for the Fourth Circuit considered this statute in *Reid v. Kayye*, 885 F. 2d 129, 131 (4th Cir. 1989). The Court stated, "We must conclude . . . that use of the word 'may' in § 153A-223 is purposeful and that DHR officials are not vested with the mandatory duty to remedy substandard jail conditions." *Id.* Any enforcement action by defendant is couched in the discretionary language of "may" or "should." *Id.* The statute and the decisions interpreting the statute show the Legislature's clear intent for the State and its agencies to have a limited role inspecting and reporting on local jail facilities to prompt remedial action by the local governing body *Id.*

In *Braswell* and reiterated in *Stone* and *Hunt*, our Supreme Court recognized the limited resources and duty of the State. "For the courts to proclaim a new and general duty of protection in the law of tort . . . would inevitably determine how the limited [public] resources . . . should be allocated and without predictable limits." *Braswell*, 330 N.C. at 371, 410 S.E.2d at 901-02. Past precedents bind us to "refuse to judicially impose an overwhelming burden of liability on defendants" for DHHS's alleged failure to prevent Mitchell County and its sheriff's alleged negligence in the care, custody, and maintenance of its confinement facility. *Stone*, 347 N.C. at 481, 495 S.E.2d at 716. Mitchell County and its sheriff, not the State, bore the duty and responsibility to ensure the safety of the detainees in the county jail. N.C. Gen. Stat. § 162-22. Mitchell County recognized that duty and settled all of plaintiffs' claims.

Clear and controlling precedents show the state is not liable for the tragic injuries or deaths that occurred in the Mitchell County jail. The public duty doctrine shields the State from liability for negligence claims from "the alleged failure of a state agency to detect and prevent misconduct of a third party through improper inspections." *Myers*, 170 N.C. App. at 503, 613 S.E.2d at 337.

The regulatory powers of the state government are extensive and, in one way or another, reach virtually every aspect of our lives. The natural extension of the majority's unprecedented and unwarranted interpretation has far reaching implications. Under the majority's holding, a citizen who becomes ill from eating spoiled food at a restaurant could hold the State liable because DHHS has a statutory duty to inspect food establishments. N.C. Gen. Stat. § 130A-249 (2003) ("The Secretary may enter any establishment that is subject to the provisions of G.S. 130A-248 for the purpose of making inspections. The Secretary shall inspect each restaurant at least quarterly . . ."). These inspections are twice as frequent than what the statute requires of defendants here. N.C. Gen. Stat. § 153A-222 ("Department personnel shall visit and inspect each local confinement facility at least semiannually").

Similarly, a patient who receives negligent medical care or a client who receives faulty legal advice or whose lawyer stole the client's money could hold the State liable for negligent inspection, testing, and licensing of applicants. The State of North Carolina, through the North Carolina Medical Board, the North Carolina Board of Law Examiners, and the North Carolina State Bar licenses

and regulates the practices of medicine and law, including theft of a client's funds by an attorney. N.C. Gen. Stat. § 90-4 (2003); N.C. Gen. Stat. § 84-24 (2003); N.C. Gen. Stat. 84-23 (2003). State boards and agencies license and regulate a host of other professions and occupations. *See e.g.*, real estate appraisers (N.C. Gen. Stat. Chapter 93E); cosmetic art (N.C. Gen. Stat. Chapter 88B); teachers (N.C. Gen. Stat. Chapter 115C).

Not content with their substantial settlements from Mitchell County, plaintiffs now seek to also cash out from the taxpayers of this State. *Braswell* and its progeny, *Stone* and *Hunt*, have stood as binding precedents under these facts for over fifteen years without any affecting amendment of the Tort Claims Act by the General Assembly. *Blackmon v. N.C. Dept. of Correction*, 118 N.C. App. 666, 673, 457 S.E.2d 306, 310 (1995) ("[I]t is appropriate to assume the legislature is aware of any judicial construction of a statute.") The holdings in *Spicer*, *Levin*, and *Shields*, cited in the majority's opinion, all reinforce the legislature's intent that any individual duty owed to plaintiffs rests with the officials of the local governmental unit that own, operate, and maintain the jail, not the State.

### B. "Special Relationship"

After having cited no controlling precedents or binding authority to support its broad interpretation, the majority's opinion states, "Even if we could conclude that the statutes and regulations imposed a duty to inspect for the benefit of the public, we would still hold that plaintiffs fall within the 'special relationship' exception to the public duty doctrine."

For the "special relationship" exception to apply, it "must be specifically alleged, and is not created merely by a showing that the state undertook to perform certain duties." *Lane v. Kinston*, 142 N.C. App. 622, 625, 544 S.E.2d 810, 813 (2001) (citation omitted). "In sum, the 'special duty' exception to the general rule against liability . . . is a very narrow one; it should be applied only when the promise, reliance, and causation are manifestly present." *Braswell*, 330 N.C. 372, 410 S.E.2d at 902. A "special relationship" may exist when plaintiffs are held in police custody. However, if that "special relationship" exists, it is between the detainees and Mitchell County and its sheriff, *not the State*.

The applicable statutes noted above clearly indicate that the Legislature intended the responsibility for the care and custody of

local jails to be borne by the county and the sheriff. The State did not waive its sovereign immunity or place such activities outside the public duty doctrine. Mitchell County and the Sheriff of Mitchell County bore the responsibility to ensure the county's confinement facilities were maintained in a safe condition for the detainees. Liability arising out of a "special relationship" is the liability of Mitchell County, which settled plaintiff's claims.

### IV. Conclusion

The Industrial Commission failed to follow clearly controlling precedents and erred as a matter of law in denying the State's motions to dismiss plaintiff's claims due to the public duty doctrine. The Commission and this Court are bound by clear Supreme Court precedents. None of the statutes before us expressly impose liability on the State to an individual for the negligence of a third party.

For over fifteen years after the Supreme Court's decisions in *Braswell* and its progeny, the General Assembly has not amended the Tort Claims Act to alter or abolish the application of the public duty doctrine for alleged negligent inspections by state agencies to allow recovery for an individual's alleged injury as a result of actions by a third party.

I completely agree with the statement in the majority's opinion that "[t]his Court must . . . be ever vigilant not to act as a super-legislature that imposes its notion of public policy in the face of statutory determinations otherwise. It is for the General Assembly, and not judges, to decide questions of public policy regarding how and when the State may be sued." The General Assembly has spoken through the absence of legislation to reduce, alter, or abolish the public duty doctrine in North Carolina. Its intent should control the result here.

Detainees in the Mitchell County jail were killed or injured as a result of a tragic fire. "This Court should not, however, permit these 'bad facts' to lure it into making 'bad law.' " *N.C. Baptist Hospitals, Inc. v. Mitchell*, 323 N.C. 528, 539, 374 S.E.2d 844, 850 (1988). I respectfully dissent.